608 So.2d 314 (1992)
Sabrina BUTLER
v.
STATE of Mississippi.
No. 90-DP-0449.
Supreme Court of Mississippi.
August 26, 1992.
*315 Mose Lee Sudduth, Jr., Columbus, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty., Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
Nine-month-old Walter Dean Butler was brought to the emergency room of Columbus Hospital by his mother, Sabrina Butler, at 12:13 a.m. on April 12, 1989. The infant was dead on arrival, and attempts at resuscitation were unsuccessful. The baby died as a result of severe internal injuries. Sabrina was questioned about the cause of the injuries to her infant son, gave conflicting statements, and was ultimately placed under arrest later that morning for the capital murder of Walter Dean Butler.
Sabrina was indicted at the May Term, 1989, grand jury of Lowndes County for capital murder in violation of Miss. Code Ann. § 97-3-19(2)(f) (Supp. 1991), i.e., the killing of Walter Dean Butler while engaged in the commission of felonious child abuse and/or battery of a child. Trial commenced on March 8, 1990, and resulted in a guilty verdict and sentence of death by lethal injection. We reverse.

FACTS
Everyone who viewed the body of Walter Dean Butler in the early morning of April 12, 1989, remarked that his stomach was noticeably distended (swollen). The swelling was caused by severe internal injuries and bleeding. An autopsy revealed several abrasions, bruises and scars, in addition to the distended abdomen and a prolapsed rectum. Some marks, of course, were caused by medical personnel in the effort to resuscitate the child.
Internally, the autopsy revealed two areas of rupture or perforation in the small intestine, as well as bruising and bleeding. There was a substantial amount of "fluid and fecal-like material ... floating free inside *316 the abdominal cavity" which had entered the cavity through the perforations in the wall of the small intestine. The right adrenal gland, which sits atop the right kidney, was also lacerated.
A microscopic examination showed "acute inflammation involving the serosal [or outer] surfaces of most all of the organs within the abdominal cavity." This condition is called acute peritonitis, and is the body's response to the presence of foreign substances in the abdominal cavity. It was explained at trial that peritonitis generally does not set in until at least an hour after the internal damage is done.
Expert opinion was offered that Walter Dean Butler's death was "directly related to the perforations in the duodenum and ... the events that resulted immediately after that," i.e. the acute peritonitis. As for what caused the internal injuries resulting in death, Dr. Hicks, the pathologist who performed the autopsy, testified that some type of blunt trauma, or "substantial blunt force to the abdomen," had to be the culprit. This opinion was shared by all other medical personnel who testified. No witness accepted the defense's theory that a clumsy attempt at CPR caused such massive injuries.
Sabrina Butler was questioned by medical personnel and police several times during the early morning hours of April 12, 1989. She gave conflicting versions of what happened. She initially told medical personnel that a baby-sitter had given the child Benedryl and Tylenol. She stated that Walter Dean had been staying with a baby-sitter by the name of Ester Hollis who lived in the same apartment complex. Upon Sabrina's return, Ester Hollis's son came upstairs to the apartment and told her that Walter Dean had stopped breathing. Sabrina claimed to have gone downstairs to the Hollis apartment, couldn't get anyone to answer the door for 10-15 minutes, and finally got someone, later identified as Larry Nance, to drive her and the baby to the hospital. Sabrina stated that she attempted cardiopulmonary resuscitation along the way.
A little later, Sabrina told police she left her child with Hollis about 2:00 p.m. on April 11, 1989. Sabrina was expecting company that evening, and about 9:00 p.m. a man named Steve stopped by her apartment. Steve allegedly stayed about thirty minutes, and about 10:00 p.m., Sabrina went jogging. When she returned, Ester Hollis's son came to her apartment with news that Walter Dean had stopped breathing. Sabrina went to Ester's apartment and attempted to resuscitate the child by blowing in its mouth and pushing on its stomach. She then went door to door for help. A neighbor by the name of Brenda Jackson couldn't help, a girl named Lisa Flowers tried to help, and a man named Larry Nance, who lived in Apartment 2, drove them to the hospital.
Later still, Sabrina gave largely the same story to another officer, except to say that she had gone jogging first, that Steve stopped by around 10:30 p.m., and Ester Hollis's son came to her apartment regarding Walter Dean about 11:00 p.m.
Officers then proceeded to the apartment complex where Sabrina lived to interview any potential witnesses, and to locate Ester Hollis. After a thorough check of other apartments, no person by the name of Ester Hollis was found. In fact, nobody they spoke to ever had heard of Ester Hollis.
Sabrina was interviewed later at the morgue. She was told that Ester Hollis could not be located. Sabrina recanted parts of her earlier story, claiming she had lied previously out of fear, and stating that everything was better now because she was going to be with Walter Dean.
Sabrina then gave an amended version of her story which goes as follows: The baby was with her all day. At about 10:00 p.m., April 11, 1989, she put the baby in a stroller, and, with baby in tow, she went jogging. Sabrina returned to her apartment about 10:20 p.m., and a man named Steve arrived there about 10:30 p.m. Steve did not stay long, and Sabrina put Walter Dean to bed. She checked the baby about 11:00 p.m., and he appeared normal. She checked him again at 11:30 p.m. and discovered he wasn't breathing. She sought help *317 from her neighbors. Larry Nance agreed to take them to the hospital, and en route Sabrina attempted to resuscitate the child with methods resembling CPR.
Sabrina accepted a request to submit to questioning at police headquarters, and arrived there around 3:00 a.m., April 12. There, she gave yet another statement, and once again, her story changed somewhat, this time admitting that she had lied about the baby-sitter, and about receiving a visit from a man named Steve. The statement, as transcribed and summarized by one of the interviewing officers, reads as follows:
Walter was playing with his toys in the living room before 10 p.m. and I fed him some milk. I washed him off around 10 p.m. and put him to bed. I took a shower and eat then I put on my jogging pants and got Walter up and wrapped him up. I put him in his stroller and went outside to jog. I went up 27th St. N. to the street that goes to 26th St. N. then down 26th St. N. for less than a block. I then jogged back home pushing Walter in the stroller. I then went back inside and put Walter to bed and went into my room and laid on the floor because of my back. I got up at about 11:30 p.m. to use the bathroom and check on Walter. When I went into his room he was lying on his stomach and I moved the cover and put his bottle in his mouth and I saw he wasn't breathing. I started pressing on his stomach and blowing in his mouth trying to get him to breathe. I ran out of my apartment to Brenda Jackson's apartment and asked her to take me to the hospital but she said her kids were in the bed and that she couldn't take me. I knocked at another apartment door but no one answered. A girl (Lisa Flowers) came out of her apartment and I told her that my baby wasn't breathing. She grabbed him and took him into Erica's apartment and laid him on the floor[. S]he was pushing on his chest and blowing in his mouth. She got some people (Larry Nance) to take us to the hospital. We went to C.H.I. where Doctor Woodard in the emergency room saw Walter. I talked to a nurse and she had me fill out some papers. Dr. Adams came out and told me that there wasn't anything else they could do. Walter fell out of his stroller sometime around the first of last week and fell over onto the carpet causing some abrasions on his face. Other than this he has received no other injuries that I am aware of.
At 7:00 a.m. that same morning, Detective Edward Williams of the Columbus Police Department attended a briefing, and was informed of the incident involving Sabrina and Walter Dean Butler. He was directed to go with Lt. Donald Freshour to Sabrina's apartment, and to interview potential witnesses. They got no answer at Sabrina's, were unable to locate anybody named Ester Hollis, and left a message with neighbors that they needed to talk with Sabrina. Later that morning, Sabrina voluntarily came to the police department.
Williams, Lt. Freshour, and Sabrina went into Williams's office. They explained to Sabrina why they wanted to question her. Her rights were read and explained to her, and she executed a written waiver. She gave a statement which was reduced to writing and approved by her. Once again, her story varied.
In this latest statement, Sabrina stated that she put Walter Dean to bed around 10:00 p.m. on the night of April 11, 1989. After making sure he was asleep, Sabrina left her apartment and went jogging for about 10 minutes. Upon her return to the apartment, the baby was awake and crying. Finding a wet diaper, Sabrina began changing it, and noticed in the process that Walter Dean's rectum was protruded. She used a finger to "push [his rectum] up inside him." When the baby would not quit crying, Sabrina took her fist and hit the baby once in the abdomen. She then took him into the kitchen and gave him a Tylenol/milk solution to drink.[1] She said he took one swallow and quit breathing. *318 She sought help from her neighbors, and got Larry Nance to drive them to Columbus Hospital. The baby was dead.
After giving this statement, Sabrina was arrested and charged with capital murder. She was ultimately convicted and sentenced to death. None of the facts as related by the State's witnesses were seriously contested by Butler, and she rested at trial without offering any witnesses or other evidence. She attempted through cross-examination of the prosecution's witnesses to establish reasonable doubt whether the injuries to Walter Dean Butler could have been caused by an attempt to perform CPR. She also seriously contested the admissibility of her statements, to no avail.

LAW

I. SUFFICIENCY AND WEIGHT OF THE EVIDENCE
We find no merit to any of the assignments attacking the sufficiency and weight of the evidence to convict.

II. COMMENT ON BUTLER'S FAILURE TO TESTIFY
When an accused exercises his or her constitutional right not to testify, the circuit judge must see that the State makes no direct or indirect comment on this fact. See e.g. Ladner v. State, 584 So.2d 743, 754 (Miss. 1991), cert. denied ___ U.S. ___, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); Livingston v. State, 525 So.2d 1300, 1305-08 (Miss. 1988). Though painful, the responsibility and duty of a circuit judge when such a comment is made is to declare a mistrial on the spot. Such celerity on the circuit judge's part will not only have a salutary effect, but promote judicial economy in sparing this Court the task of the inevitable reversal.
In this case Butler did not testify. She had made statements to law enforcement officers duly admitted into evidence. It was competent for the district attorney to comment on the weight and worth of what was in evidence, but he also had the duty to carefully, very carefully refrain from making any remark which directly or by insinuation focused the jurors' attention or alerted them to the fact that Butler did not take the stand. Miss. Const. of 1890, Art. 3 § 26; U.S. Const. Amend. V; Miss. Code Ann. § 13-1-9 (1972) (Repealed by Laws, 1991, Ch. 573, § 141, eff. July 1, 1991.) That was an art he was obligated to master.[2]
In the course of closing argument, the prosecution made several jabs around the perimeter of commenting upon Butler's failure to testify. What clearly amounted to comments on her failure to testify, however, were the following:
Ladies and Gentlemen, that is an admission of guilt, but I submit to you she hasn't told you the whole truth yet.
... .
Ladies and Gentlemen, those bruises were not inflicted by the same wound that created the massive internal injuries that subsequently killed this child. It could not have happened. So, Ladies and Gentlemen, she has not yet told you the whole truth of the torment she subjected her son to. You still don't know the whole story. Incredible, unbelievable evasion from start to finish. Ladies and Gentlemen, is that what an innocent person does?
Objections to these comments were overruled.
The only living witness, of course, to the infant's death was Butler. She was the only person who could tell what had happened. As noted, the prosecuting attorney could have very properly evaluated the weight and worth of the statements she had given the law enforcement officers, so long as there was no suggestion about her failure to testify. Shook v. State, 552 So.2d 841, 851 (Miss. 1989); Alexander v. State, 520 So.2d 127, 130 (Miss. 1988).
When he added, however, that Butler "hasn't told you the whole truth yet," (emphasis *319 added) there was no escaping a wonder in the jurors' minds that there was more to come if she had taken the witness stand. He proceeded to exacerbate an already reversible error by adding, "you still don't know the whole story." (Emphasis added) Who was the only person alive who could give "the whole story?" Butler.
The prosecution could hardly have made the point plainer if it had simply come out and said, "There is a lot more to tell, but Butler has not seen fit to get on the witness stand and tell you."
These comments were reversible error, so egregious in fact that even if there had been no objection at trial, we would nevertheless have been obligated to reverse. Livingston, 525 So.2d at 1305-08.
Because we reverse on this ground, the remainder of the opinion is confined to questions likely to recur on retrial.

III. IDENTICAL OFFENSE INSTRUCTIONS
Miss. Code Ann. § 97-3-19(2)(f) (Supp. 1991) reads:
§ 97-3-19. Homicide; murder defined; capital murder
... .
(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
... .
(f) When done with or without any design to effect death, by any person engaged in the commission of the crime of felonious abuse and/or battery of a child in violation of subsection (2) of section 97-5-39, or in any attempt to commit such felony;
This statute authorizes a conviction of capital murder if Butler was engaged in the crime of a felonious child abuse, whether or not she intended to kill the infant. Killing the baby in the commission of this crime of itself authorized a conviction under this statute.
Miss. Code Ann. § 97-3-27 (1972) reads:
§ 97-3-27. Homicide  killing while committing felony.
The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are above enumerated and excepted, shall be manslaughter.
This statute authorizes a conviction of manslaughter for a killing in the course of the commission of a crime "except rape, burglary, arson or robbery," even though there was no intent to kill. The killing of this baby in the commission of felonious child abuse authorizes a conviction under this statute.
Felonious child abuse is defined under Miss. Code Ann. § 97-5-39(2) (Supp. 1991):
§ 97-5-39. Contributing to the neglect or delinquency of a child; felonious abuse and/or battery of a child.
... .
(2) Any person who shall intentionally (a) burn any child, (b) torture any child or, (C) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child and, upon conviction, may be punished by imprisonment in the penitentiary for not more than twenty (20) years. (Emphasis added)
Thus, for Butler's criminal offense there are two criminal statutes, one authorizing a conviction of capital murder, and the other manslaughter. Butler requested and was refused an instruction authorizing her conviction under Miss. Code Ann. § 97-3-27. The State argued such an instruction would confuse the jury. The State did agree to a heat of passion manslaughter instruction.
If Miss. Code Ann. § 97-3-19(2)(f) required, in order to convict, that the killing have been intentional, then clearly Butler would have been entitled to a manslaughter instruction based on Miss. Code Ann. § 97-3-27 as a lesser included offense, the only ingredient lacking being intent. *320 Should she be deprived of such instruction when the statutes, as in this case, are for all intents and purposes identical? Mease v. State, 539 So.2d 1324, 1329-30 (Miss. 1989); see also Mackbee v. State, 575 So.2d 16, 23 (Miss. 1990); Harper v. State, 478 So.2d 1017, 1021 (Miss. 1985).
It is well established that where there are two separate criminal statutes for the same offense, the State has a choice of deciding the statute under which to prosecute. Rowland v. State, 531 So.2d 627, 631-32 (Miss. 1988); Craig v. State, 520 So.2d 487, 491 (Miss. 1988); Cumbest v. State, 456 So.2d 209, 223 (Miss. 1984). It is also settled that in such cases the accused is not entitled to have the jury instructed on the statute carrying the lesser penalty. Identical offenses do not authorize lesser included offense instructions. Rowland, 531 So.2d at 631-32. We do not depart from these principles in the general run of criminal prosecutions.
In this case, however, we have a defendant who, under the capital murder statute, was sentenced to death when there was another criminal statute for the same offense with the maximum penalty of twenty years imprisonment. Compare Miss. Code Ann. §§ 97-3-25 (1972), 97-3-21 (Supp. 1991).
We conclude that Butler was entitled to have the jury instructed that she could be convicted under Miss. Code Ann. § 97-3-27, the manslaughter statute.
For over a half century, this Court has approved circuit courts granting heat of passion manslaughter instructions to the State in a homicide prosecution which is either murder or justifiable homicide committed in lawful self defense, and there is no element whatever of a heat of passion slaying under Miss. Code Ann. § 97-3-35 (1972). See Mease v. State, 539 So.2d at 1338 (Hawkins, P.J., concurring).[3] It is not an even-handed administration of justice in turn to deny the defense a manslaughter instruction where the accused, as is the case here, could have been lawfully indicted and prosecuted for manslaughter as easily as capital murder. And especially is this true where one verdict can bring a sentence of death and the other a maximum of twenty years imprisonment. Indeed, we do not think any prosecuting attorney should have it in his power to prosecute a defendant for capital murder when the same offense could be prosecuted under a statute with a less severe penalty and also prevent a jury from considering whether she should be found guilty only under the statute carrying the lesser punishment.
Our conclusion is fortified in that Miss. Code Ann. § 99-17-20 (Supp. 1991), a criminal procedure statute in capital murder cases, contains a provision authorizing such an instruction:
The judge, in cases where the offense cited in the indictment is punishable by death, may grant an instruction for the state or the defendant which instructs the jury as to their discretion to convict the accused of the commission of an offense not specifically set forth in the indictment returned against the accused.[4]

IV. EX POST FACTO CLAIM
On April 11-12, 1989, the date of the commission of the crime, Miss. Code Ann. § 97-5-39(2) required in order to convict of child abuse that the injury inflicted must have been "in such a manner so that any bone is fractured or any part of the body of such child is mutilated, disfigured or destroyed." Miss. Code Ann. § 97-5-39(2) was amended, effective April 21, 1989, to require merely that the defendant *321 intentionally injured the child "in such a manner as to cause serious bodily harm."
Instruction SGP-3 granted to the State instructed the jury under the amended version of the statute, authorizing a conviction if the injury was in such a manner as to cause "serious bodily injury."
Although Butler is procedurally barred on this appeal from arguing the granting of this instruction was error because she did not object to it at trial, Colburn v. State, 431 So.2d 1111, 1113-14 (Miss. 1983), on retrial she is entitled to have the jury instructed according the statute as it read at the time of the commission of the offense.[5]

V. DID THE DENIAL OF FUNDS FOR INDEPENDENT EXPERTS DEPRIVE BUTLER OF HER RIGHTS?
Butler contends her motion for funds to hire the services of a psychiatrist and an investigator should have been granted, citing Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
Butler was evaluated by a psychiatrist from the State Hospital at Whitfield. This satisfied "the constitutional mandate of [Ake v. Oklahoma]." Willie v. State, 585 So.2d 660, 671 (Miss. 1991).
Furthermore, Butler failed to show "substantial need" for an investigator. Something more than "undeveloped assertions that the requested assistance would be beneficial" is required. Hansen v. State, 592 So.2d 114, 125 (Miss. 1991), cert. denied ___ U.S. ___, 112 S.Ct. 1970, 118 L.Ed.2d 570 (1992)k reh'g. denied 1992 WL 143119 (1990). The lawyer should state specifically why he needs an investigator. Why should an investigator be necessary to perform tasks an attorney ordinarily performs? The circuit court did not abuse its discretion by denying Butler's request. Id.; Griffin v. State, 557 So.2d 542, 550-51 (Miss. 1990).

VI. BUTLER'S STATEMENT TO LAW ENFORCEMENT OFFICERS
Butler complains of the admission into evidence of the third statement she made to law enforcement officers in which she admitted striking the baby in the abdomen.
There is no question but that the officers scrupulously gave all the Miranda warnings. Objectively, there was nothing more they could have done.
On appeal, however, Butler maintains she lacked the intelligence to knowingly waive her 5th and 6th amendment constitutional rights.
In the 1966 landmark decision, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the U.S. Supreme Court mandated specific warnings to an accused  for many years now familiar to every law enforcement officer  of her right to remain silent, that anything she said could be used against her, that she had a right to the presence of an attorney, and an attorney would be appointed for her if she could not afford one. The Court added that after such warnings, "the individual may knowingly and intelligently waive these rights." (Emphasis added) The Court also stated that when an interrogation continued without the presence of an attorney, a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel." (Emphasis added) 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. See also, Fare v. Michael C., 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 212 (1979); Moran v. Burdine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410, 421 (1986). In Edwards v. Arizona, 451 U.S. 477, 486 n. 9 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 387 (1981), the Court held that whether or not the purported waiver was knowingly and intelligently given was to be found "under the totality of the circumstances."
In a hearing challenging the competency of a confession, any careful circuit judge *322 can rather easily determine by objective inquiry whether the specific warnings required by Miranda were given. But, suppose the accused is of limited intelligence as so frequently is the case in criminal prosecutions? Miranda has been consistently interpreted by this Court, as well as other state and federal courts, to additionally require a trial court inquiry into the mental capacity of the accused, a far more difficult undertaking. Did he have the mental capacity to knowingly and intelligently waive two very valuable rights guaranteed by the U.S. Constitution  the right not to incriminate himself, and the right to have the presence and advice of a lawyer before he said anything? Merrill v. State, 482 So.2d 1147 (Miss. 1986); Stevens v. State, 458 So.2d 726 (Miss. 1984); Neal v. State, 451 So.2d 743 (Miss. 1984); Gator v. State, 402 So.2d 316 (Miss. 1981); Lee v. State, 338 So.2d 399, 401 (Miss. 1976); Hancock v. State, 299 So.2d 188 (Miss. 1974); Harrison v. State, 285 So.2d 889 (Miss. 1973); Dover v. State, 227 So.2d 296 (Miss. 1969); Harvey v. State, 207 So.2d 108 (Miss. 1968). See, Annotation, Mental Subnormality as Affecting Voluntariness or Admissibility of a Confession, 8 A.L.R. 4th 16 (1981). Winfrey v. Wyrick, 836 F.2d 406 (8th Cir.1987) cert. denied sub nom. 488 U.S. 833, 109 S.Ct. 91, 102 L.Ed.2d 67 (1988); Cooper v. Griffin, 455 F.2d 1142 (5th Cir.1972); People v. Henderson, 83 Ill. App.3d 854, 39 Ill.Dec. 8, 404 N.E.2d 392 (1980); Commonwealth v. Daniels, 366 Mass. 601, 321 N.E.2d 822 (1975).
The above decisions support the finding of the circuit judge in this case that Butler had the intelligence to waive these rights.
More importantly, however, the U.S. Supreme Court in Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), held that there is no Constitutional requirement that an accused "knowingly and intelligently" waived his or her 5th or 6th Amendment rights.
Respondent would now have us require sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State. We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, see, e.g., Fed Rule Evid 601, and not by the Due Process Clause of the Fourteenth Amendment. "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." Lisenba v. California, 314 US 219, 236, 86 L Ed 166, 62 S Ct 280 [289] (1941).
We hold that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause.
... .
We think that the Supreme Court of Colorado erred in importing into this area of constitutional law notions of "free will" that have no place there. There is obviously no reason to require more in the way of a "voluntariness" inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion. See United States v Washington, 431 US 181, 187 [52] L Ed 2d 238, 97 S Ct 1814 [1818] (1977); Miranda, supra, [384 U.S.] at 460, 16 L Ed 2d 694, 86 S Ct 1602 [1620] 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." Oregon v. Elstad, 470 US 298, 305, 84 L Ed 2d 222, 105 S Ct 1285 [1290] (1985). The voluntariness *323 of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. (Emphasis added)
Colorado v. Connelly, 479 U.S. at 166-70, 107 S.Ct. at 521-23, 93 L.Ed.2d at 484-86.
Thus, under Colorado v. Connelly, there is no Constitutional requirement in making a determination whether a confession is free and voluntary to examine the mental capacity of the defendant; the focus is directed entirely to conduct on the part of the state. Also, Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir.1988) cert. denied 489 U.S. 1059, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989); Winfrey v. Wyrick, 836 F.2d at 411; Penry v. Lynaugh, 832 F.2d 915, 918 (5th Cir.1987), reversed in part on other grounds, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).
Even though there is no Constitutional requirement to do so, it nevertheless remains true as a matter of evidence that before any confession is admissible, it must have been given by a person with enough intelligence to be a competent witness. 23 C.J.S. Criminal Law, § 828; Redwine v. State, 258 Ala. 196, 61 So.2d 724 (1952); Ford v. State, 75 Miss. 101, 21 So. 524 (1897). Butler obviously had the intelligence to understand the statements she made to law enforcement officers.
It is also true that, aside from any constitutional guarantee, an extorted confession has always been considered worthless as evidence. This Court has always recognized that a confession resulting from threats, physical force or promise of reward was not free and voluntary, and, therefore, incompetent as evidence. "The vice of induced confessions, whether under pressure of threat or promise, is seen not so much in the method as in the result. It is the improbability of its being true that vitiates it, even though the courts take frequent occasion properly to condemn forcible methods." Usrey v. State, 198 Miss. 17, 22, 20 So.2d 847, 848 (1945). See also Ammons v. State, 80 Miss. 592, 32 So. 9 (1902); Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900). See generally 3 Wigmore, Evidence § 822 (Chadbourn Rev. 1970).

VII. IMPEACHMENT OF BUTLER WITH PRIOR CONVICTION
After the prosecution rested its case, the trial court held a hearing, Peterson v. State, 518 So.2d 632 (Miss. 1987), to determine the admissibility, for impeachment purposes, of Butler's prior conviction for uttering a forged instrument. Butler argues under the Peterson four part test that the prior conviction should not be admissible. Butler also claims that it was prejudicial to postpone the hearing on the admission on the prior conviction until the prosecution has rested its case.
Rule 609(a) of the Mississippi Rules of Evidence states:
General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect on a party or (2) involved dishonesty or false statement, regardless of the punishment.
The Comment to Rule 609 states that Peterson sets forth the guidelines to determine the admissibility of convictions under Rule 609(a)(1), not 609(a)(2). The Comment also states that
[t]he phrase `dishonesty or false statement' in 609(a)(2) means crimes such as perjury, false statement, fraud, embezzlement, false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.
The admission of prior convictions involving dishonesty or false statement is not within the discretion of the court. Such *324 convictions are peculiarly probative of credibility and are always to be admitted.
Because the prior conviction was "in the nature of crimen falsi," the trial court did not have to hold a Peterson hearing. Under 609(a)(2) the prior conviction of uttering a forged instrument is admissible, and its admissibility is not within the discretion of the court. Johnson v. State, 525 So.2d 809 (Miss. 1988).
Also, it is discretionary with the trial court whether to give an advance ruling on the admissibility of prior convictions for impeachment purposes. McInnis v. State, 527 So.2d 84 (Miss. 1988). The circuit judge did not abuse his discretion in holding a hearing on the admissibility of Butler's prior conviction at the close of the prosecution's case.
REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
PRATHER, J., not participating.
NOTES
[1] Significantly, there was no indication of milk or medicine in the stomach, although a lot of its contents had spilled into the cavity.
[2] The tactical advantage of having the jury wonder why, if the defendant was innocent, he did not testify, is a temptation prosecuting attorneys, especially the younger ones, find difficult to resist.
[3] "It was in Calicoat v. State [131 Miss. 169, 95 So. 318 (1923)] that this Court started down this road holding  despite vigorous dissents  that it was `harmless error' to give a manslaughter instruction to the State where there was proof from which the jury could find the defendant guilty of murder," even though there was no element of manslaughter. Mease v. State, 539 So.2d at 1338.
[4] While we recognize that the genesis of the statute was Jackson v. State, 337 So.2d 1242 (Miss. 1976), it is nevertheless plain that the statute specifically authorizes an instruction as requested by Butler. It is not restricted to lesser included offense instructions, which an accused would be entitled to aside from any statute.
[5] This conclusion disposes of any need to address Butler's additional claim that the phrase "serious bodily injury" is unconstitutionally vague.