# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-KA-00353-SCT

*BILLY JOE BARNETT*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/30/94 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | P.J. TOWNSEND |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT ALLRED |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 06/11/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/21/98 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. Billy Joe Barnett appeals from a jury verdict in the Circuit Court of Attala County finding him guilty of the murder of Jerry Tavares. The appellant brings forth numerous issues, including whether the admission into evidence of a statement made during plea discussions constituted reversible error. Because we find that the admission of the statement was error and violated the rules of evidence, we reverse and remand this cause for further proceedings consistent with this opinion.

### I.

¶2. Jerry Tavares was killed on or about the night of May 11 or the morning of May 12, 1992. On May 12, 1992, Gloria Guillory discovered Jerry Tavares's body on a county road about a mile from Highway 12 toward McCool and the Attala-Choctaw County line. Tavares was in the road in front of a Chevrolet Blazer. Guillory notified law enforcement, and sheriff's department personnel subsequently investigated the scene.

¶3. Two nine-millimeter bullet shells were recovered near Tavares's body. According to the pathologist, Dr. Steven Hayne, there were multiple gunshot wounds-- one over Tavares's left temple,

two in the back to the left, and one in the mid-chest field. The cause of death was determined to be gunshot wounds delivered by a large-caliber weapon, consistent with a nine-millimeter handgun. On January 5, 1994, a nine-millimeter automatic pistol and a bullet clip were pulled from a Clay County creek. Ballistics tests confirmed that the gun was the same one used to shoot and kill Jerry Tavares.

¶4. On February 16, 1994, Billy Joe Barnett was indicted with Ilene Tavares, Glen Dale Davis and Bennie Cork for the capital murder of Jerry Tavares on May 11, 1992, under Miss. Code Ann. § 97-3-19(2). Barnett was re-indicted on September 6, 1994, in a two-count indictment charging capital murder and conspiracy to commit capital murder. On September 15, 1994, Barnett was arraigned on this superceding indictment. The conspiracy count was eventually severed, and Barnett went to trial on September 27, 1994 on the capital murder charge. The prosecution sought the death penalty.

¶5. On September 30, 1994, the jury returned a verdict of guilty on the capital murder charge. On the same day, in the sentencing phase, the jury found that Barnett should be sentenced to life imprisonment without parole. The trial court entered judgment accordingly, and Barnett timely appeals.

## II.

¶6. Because of our disposition of this issue and its impact upon this matter, we first address Barnett's contention that the statement he gave on September 20, 1994 was precipitated by plea negotiations and therefore should not have been admitted into evidence.

¶7. The State counters that the statement was not made in the context of plea negotiations with a prosecuting attorney, but instead was initiated by Barnett and his attorneys and given to a law enforcement officer. The trial court admitted the statement, determining that the statement was merely an "interview by law enforcement to find out what Mr. Barnett knew about the case."

¶8. Mississippi Rule of Evidence 410 governs the admissibility of statements made during plea negotiations and provides in pertinent part that:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> (1) A plea of guilty which was later withdrawn;
>
> (2) A plea of nolo contendere;
>
> (3) Any statement made in the course of any proceedings under Mississippi statutory or rule of court provisions regarding either of the foregoing pleas;
>
> or
>
> (4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which does not result in a plea of guilty or which results in a plea of guilty later withdrawn.

¶9. This Court recently addressed the admissibility of statements made during plea discussions in

*Evans v. State*, 725 So. 2d 613 (Miss. 1997). There, the defendant was charged in the neighboring state of Louisiana with kidnapping a ten-year-old girl. He was subsequently transferred to Mississippi where he confessed to murdering the child. A Mississippi grand jury indicted him for capital murder with the underlying felony of kidnapping and two counts of sexual battery.

¶10. At the trial, the State sought to introduce Evans's confessions. He argued that his confessions were the product of plea negotiations with the federal government. The evidence indicated that an Assistant United States Attorney (AUSA) had informed Evans's attorney, "if this guy ever wants anything out of us he better tell us where the child is if the child is alive." The AUSA requested a meeting with Evans in an attempt to locate the child. After several hours of discussions between defense counsel, Evans's girlfriend, Evans, and the AUSA, the defendant agreed to reveal the location of the child's body if certain conditions were met. These conditions were written by the AUSA on a sheet of paper as Evans dictated them. The crux of the conditions was that Evans wished to plead guilty to the federal crime of kidnapping and to remain under federal custody and control.

¶11. The AUSA told the defendant that he was unable to make promises, but he agreed to prosecute the defendant on the federal kidnapping charge if there was a factual basis for the crime. He wrote on the paper that he would use whatever influence he had to insure that Evans's desires be carried out. Despite the discussions, no agreements were reached, and the AUSA ended the meeting after the defendant failed to sign a document stating that he was advised of his right to remain silent. Following the end of the meeting, the AUSA left the building, but not until he instructed the remaining law enforcement personnel not to proceed in any way unless the defendant was advised of his right to remain silent.

¶12. Following the AUSA's departure, the defendant drew up a document, acknowledging that he had been advised by his attorney and a federal judge against making any statements. He then wrote that the federal offense of kidnapping had been committed and that Louisiana and Mississippi could not use the statement for any criminal purpose. Both the defendant and his attorney signed the document. Evans refused, however, to sign a waiver of rights form although his attorney informed him of the impact an incriminating statement would have on state charges.

¶13. Subsequently, the defendant gave his first of three statements in which he described the kidnapping of the girl. In his second statement, he confessed to kidnapping and murdering the child. He also gave a videotaped confession describing the kidnapping, murder, and, for the first time, sexual assault of the ten-year-old child.

¶14. On appeal, the defendant argued that his confessions were made in conjunction with plea negotiations. In addressing this issue, this Court noted the initial question, i.e., whether Evans's confessions fell within the ambit of Rule 410. Rule 410 provides that inadmissible discussions are those done "*with an attorney for the prosecuting authority.*" We found that the statements were not between Evans and a prosecuting attorney. Instead, the statements were made to a detective and FBI agent. Moreover, the evidence there indicated that the AUSA stopped his talks with Evans and left the jail prior to any statement being made. Furthermore, we noted that "'[d]iscussions with a law enforcement agency in the spirit of cooperation and with hope for leniency, are not inadmissible under [Mississippi law].'" *Evans*, 1997 WL 562044, at \*10(*quoting **United States v. Keith***, 764 F.2d 263, 265 (5th Cir. 1985)). Thus, we concluded that the defendant was not engaged in the type of

discussions contemplated by Rule 410. *Id.*

¶15. Additionally, this Court found that Evans was not involved in "plea negotiations," relying upon the reasoning in *United States v. Robertson*, 582 F.2d 1356 (5th Cir. 1978) in which the Fifth Circuit addressed whether statements made by defendants were inadmissible at a subsequent criminal trial under Fed. R. Evid. 410 and Fed. R. Crim. Prac. 11(e)(6)-- both of which mirror our Rule 410. We found the Fifth Circuit's analysis instructive, wherein that Court explained:

> [p]lea negotiations are inadmissible, but surely not every discussion between [an] accused and agents for the government is a plea negotiation. Suppressing evidence of such negotiations serves the policy of insuring a free dialogue only when the accused and the government actually engage in plea negotiations: "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions."

*Evans*, 725 So. 2d at 640 (*quoting Robertson*, 582 F.2d at 1365). The Fifth Circuit also directed trial courts to carefully consider the totality of the circumstances to determine whether a discussion should be characterized as a plea negotiation. *Robertson*, 582 F.2d at 1366. The Court established a two-tiered analysis to be used to that end. First, a court should determine whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion. Then, it should be determined whether the accused's expectation was reasonable given the totality of the circumstances. *Id.*

¶16. Applying the *Robertson* analysis to the facts and circumstances of *Evans*, we concluded that Evans's statements were not made during plea negotiations for the following reasons: 1) the AUSA repeatedly testified that he was not engaged in "plea negotiations" with the defendant; 2) both the AUSA and Evans's attorney maintained that while "some agreements" were made, they were not "necessarily tied to" a plea; and 3) the AUSA, the only governmental officer with the authority to enter plea negotiations with the defendant, terminated discussions with the defendant after he refused to sign a waiver form and left the building. No plea bargain terms had been established or accepted by either party before the AUSA left the building. Still further, the evidence indicated that, when the AUSA left, Evans and his attorney were advised that it was now a state--not federal--investigation. We therefore concluded that Evans's expectation that his confessions would not be used in a state prosecution against him was unreasonable given the totality of the preceding circumstances. *Evans*, 1997 WL 562044, at *13 (*citing Robertson*, 582 F.2d at 1366).

¶17. Here, an entirely different situation is presented than the one this Court faced in *Evans*. The State relies heavily upon the fact that Barnett made his statement to a law enforcement officer and that the prosecuting authority entered the interviewing room only *after* Barnett was given his *Miranda* rights to argue that Barnett had an unreasonable expectation and that Rule 410 is inapplicable. For several reasons, we are unpersuaded that simply because a statement is given to a police officer instead of a prosecutor who is nevertheless present and simply because the prosecutor entered the room after the defendant was given his *Miranda* warnings the statement does not fall within the prohibitions of Rule 410.

¶18. First, there is the testimony of Lieutenant Hathcock, who took Barnett's statement, that he was under the impression Barnett was giving the statement as part of a plea bargain. Another telling fact,

although not as strong as Hathcock's testimony, is the prosecutor's own words at the interview after Barnett and his attorney returned to the room -- that "the deal" was off because Barnett was not telling the truth and as a result he was going to trial and seeking the death penalty. The prosecutor's remark clearly indicates that there had been some discussions between Barnett and the prosecuting authority that he would provide a corroborating statement in exchange for the State not seeking the death penalty. In addition to this fact, the prosecutor was obviously in control of the interview because it was the prosecutor who unilaterally called the deal off.

¶19. Moreover, unlike in *Evans*, Barnett's agreement to give a statement about the murders less than a week before his trial was set to start was inextricably tied to "the deal" struck with the State. In *Evans*, we concluded that the agreements were not tied to the plea, but instead constituted independent admissions of facts given in hopes of receiving leniency--specifically to remain in federal custody. Here, however, Barnett was interested in not facing the death penalty and he was offered just that concession by the State if and only if he gave a statement. Simply put, Barnett's giving the statement was the *quid* promised in exchange for the State's *quo*, the promise not to seek the death penalty.

¶20. Based upon the totality of the circumstances, we conclude that Barnett's expectation that he was negotiating a deal which would not be used against him at trial was reasonable, that the statement was given in conjunction with plea negotiations, and that Rule 410 prohibited the admission of the statement at trial. Accordingly, we reverse and remand this matter.

### BANKS, JUSTICE, FOR THE COURT:

### III.

¶21. Barnett's final contention that will be addressed by this Court is that his sentence violated the *ex post facto* laws of the state and federal constitutions. Jerry Tavares was killed in 1992. Under the applicable statute, a jury could sentence Barnett to either death or life in prison. Miss. Code Ann. § 97-3-21. That provision was amended in 1994 to allow the option of life in prison without parole. The jury sentenced Barnett to life without parole, a punishment that was not permitted under the statute in effect when the crime was committed. Thus, he argues that his sentence is void. We cannot agree for reasons set out below.

¶22. The appropriate time for Barnett to have objected to the life without parole sentencing option was at the point that the jury was given its instructions, *at the latest*. It is axiomatic that a litigant is required to make a timely objection. *Crenshaw v. State*, 520 So. 2d 131, 134-35 (Miss. 1988). Barnett brought up the *ex post facto* violation in his request for new trial; however, it is our conclusion that even then it was not timely -- given that the verdict had already been returned. While certain issues are required to be raised in a motion for new trial, raising objections there which should have been made *at* trial has never been thought to cure the failure to object at the proper time. Objections to jury instructions made after the jury has returned a verdict and been discharged is simply too late. *Pinkney v. State*, 538 So. 2d 329, 346 (Miss. 1988), *vacated on other grounds by* 494 U.S. 1075 (1990)(noting that issue raised for first time in motion for new trial was procedurally barred); *Anderson v. Jaeger*, 317 So. 2d 902, 907 (Miss. 1975) (holding same).

¶23. Additionally, we have, on occasion, ordered that the life without parole option be allowed to

defendants facing trial after the statute was amended for capital offenses occurring before the enactment of the amendment. *E.g.*, ***Woodward v. State***, 95-0144, 9/11/95 Order (issuing mandamus ordering trial judge to apply amended statute). There, we reasoned that a sentence of life without parole is ameliorative (and thus did not pose an *ex post facto* problem) in that it provides a punishment less harsh than death. *See also* **[Lockett v. Ohio](), 438 U.S. 586, 598 (1978)**(stating that capital juries must be allowed to hear any evidence that would tend to support a sentence less than death); **[Zant v. Stephens](), 462 U.S. 862, 884-85 (1983)** (announcing the heightened need for reliability and due process in capital cases because death is a punishment different from and more severe than all others).

¶24. In this case, although the record does not reflect a specific request by the defendant, it is clear Barnett was aware that the sentencing option of life without parole would be given to the jury, and it is also clear that he relied upon the option he now complains of to escape the harsher penalty of death. We refuse to allow Barnett to now claim that a life without parole sentence violates *ex post facto* laws. Barnett waived his *ex post facto* claim with respect to the life without parole sentencing option adopted in 1994. Barnett's waiver of the *ex post facto* violation in this instance shall remain in effect for the duration of this case.

## IV.

¶25. Because the statement given by Barnett on September 20, 1994 was clearly done in conjunction with plea negotiations and because our Rule 410 expressly prohibits the admission of such statements in evidence at trial, we reverse this matter and remand for further proceedings consistent with this opinion.[(1)](#)

¶26. **PARTS I AND II: REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**McRAE, J., PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS AND SMITH, JJ., CONCUR. MILLS AND WALLER, JJ., NOT PARTICIPATING.**

**PART III: REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**BANKS, J., PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., ROBERTS AND SMITH, JJ., CONCUR. McRAE, J., DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. MILLS AND WALLER, JJ., NOT PARTICIPATING.**

### McRAE, JUSTICE, DISSENTING IN PART:

¶27. Disagreeing with the majority, I would find that Barnett's sentence to life in prison without parole was a violation of the Ex Post Facto Clause of article 3, section 16 of the Mississippi Constitution.

¶28. In 1992, when Jerry Tavares was killed, pursuant to Miss. Code Ann. § 97-3-21 (Supp. 1977), a jury could sentence Barnett to death or life in prison. The statute was amended, effective July 1,

1994, so that the penalties prescribed for capital murder are death, life imprisonment without the possibility of parole, or life imprisonment. Barnett claims that he should have been sentenced to life in prison under Miss. Code Ann. § 97-3-21, prior to its 1994 amendment, rather than being sentenced to life without parole.

¶29. The Ex Post Facto Clause is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts. *Puckett v. Abels*, 684 So. 2d 671, 673 (Miss. 1996). "One convicted should be sentenced pursuant to the statute existing on the date of his offense to avoid an ex post facto problem." *Johnston v. State*, 618 So. 2d 90, 94 (Miss. 1993). While an ex post facto claim is procedurally barred if it is not raised in the trial court, *Butler v. State*, 608 So. 2d 314, 321 (Miss. 1992), here the defense did raise an ex post facto claim in its motion for new trial. *Cf. Watts v. State*, 492 So. 2d 1281, 1291 (Miss. 1986)(finding that defendant was procedurally barred from raising issue on appeal, since it was not listed as grounds in his motion for j.n.o.v. or a new trial); *Colburn v. State*, 431 So. 2d 1111, 1113-14 (Miss. 1983)(noting that because there was no mention of constitutionality of statute in the motion for new trial, the appellant was procedurally barred from presenting it for the first time on appeal).

¶30. This Court, in *Lanier v. State*, 635 So. 2d 813, 816 (Miss. 1994), recognized that a sentence that is not authorized by law, even if agreed to by the parties, is void *ab initio*. In *Lanier*, the State and defendant Lanier agreed that Lanier would plead guilty to capital murder and would be sentenced to life imprisonment without parole. *Id.* at 815. However, at that time, the sentencing options available to a person convicted of capital murder were life imprisonment or death; life imprisonment without parole was only possible if the defendant was an habitual offender. *Id.* at 816. This Court determined that since Lanier was not indicted as an habitual offender, a life sentence qualified by the preclusion of parole was not available to him. *Id.* Similarly, the jury had already decided against the death penalty for Barnett; his only alternative sentence pursuant to Miss. Code Ann. § 97-3-21, as it existed at the time of the offense, was life imprisonment. Therefore, Barnett's life sentence could not have been qualified by the preclusion of § 97-3-21, as it existed after Jerry Tavares was killed, since the option of life imprisonment without parole was not in existence at Tavares's death. *See Lanier*, 635 So. 2d at 816; *Johnston*, 618 So. 2d at 95-96.

¶31. The rationale of *Irving v. State*, 441 So. 2d 846, 852 (Miss. 1983), as advanced by the State, is not applicable. "Where there is a state constitutional entitlement to some due process right, the State may not enact legislation to impede that right under ex post facto analysis." *Hill v. State*, 659 So. 2d 547, 551 (Miss. 1994). *See also Johnston*, 618 So.2d at 95 (holding that ex post facto prohibitions bar retroactive applications of statutory law unless the changes are "procedural and ameliorative"). The changes made to Miss. Code Ann. § 97-3-21 affected a substantive right of Barnett, i.e., his right to be sentenced under the statute existing on the date of his offense. *Johnston*, 618 So.2d at 94. Here there was an obvious change in the quantum of punishment attached to the crime. *See Miller v. Florida*, 482 U.S. 423, 434-35 (1987) (holding that the operation of more severe sentencing guidelines to crimes that were committed before the guidelines' establishment constituted an increase in the "quantum of punishment" and violated the Ex Post Facto Clause). Therefore, these changes are barred under our state constitutional provisions against ex post facto law. Miss. Const. art. III, § 16. Barnett was entitled to be sentenced under the statute in place at the time of Tavares's death. By failing to do so, the trial judge erred as a matter of law.

¶32. While the majority contends that Barnett waived his ex post facto claim, it must be noted that for such a waiver to be valid, Barnett must have knowingly and intelligently waived that specific constitutional right. Barnett did not, and the trial court made no effort to see that he did. The majority is reading into the record a waiver that was not made specifically. Competent lawyers were available for both parties, and the majority should not engage in such lawyering of its own. Accordingly, I dissent with regard to this portion of the majority opinion.

1. Barnett raises several other assignments of error that this Court has carefully reviewed and found without merit. We, therefore, decline to address the remaining assignments of error.