635 So.2d 894 (1994)
Henry Lee HARRISON
v.
STATE of Mississippi.
No. 90-DP-1345.
Supreme Court of Mississippi.
April 14, 1994.
*895 Thomas M. Fortner, Jackson, John H. Holdridge, New Orleans, LA, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:

STATEMENT OF THE CASE
Henry Lee Harrison was indicted in the Circuit Court of Jackson County, Mississippi, for the capital murder of seven year-old April Sherry Turner during the commission of a rape. The lower court granted Harrison's change of venue motion and trial commenced on June 4, 1990, in Forrest County. The jury convicted Harrison and following a sentencing hearing, imposed the death penalty. Harrison duly perfected his appeal to this Court and assigns the following as error:
1. THE TRIAL COURT ERRED IN DETERMINING THAT HENRY HARRISON WAS COMPETENT TO STAND TRIAL.
2. THE TRIAL COURT ERRED IN REFUSING HENRY HARRISON A JURY TRIAL ON THE ISSUE OF COMPETENCE.
3. THE TRIAL COURT ERRED IN REFUSING TO RECUSE ITSELF INASMUCH AS IT HAD EXPRESSED OPINIONS AS TO DEFENDANT'S COMPETENCE PRIOR TO THE COMPETENCY HEARING.
4. THE TRIAL COURT ERRED IN FAILING TO RECUSE ITSELF FROM HEARING THE RECUSAL MOTION.
5. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING THE PROSECUTION'S MOTION TO ADMINISTER ANTI-PSYCHOTIC MEDICATION TO HENRY LEE.
6. GIVEN HENRY LEE'S LIFE-LONG MENTAL RETARDATION AND CHRONIC PARANOID SCHIZOPHRENIA, EXECUTION IS A DISPROPORTIONATE PUNISHMENT IN HIS CASE.
7. HENRY LEE HARRISON WAS IMPROPERLY DENIED FUNDS TO RETAIN THE ASSISTANCE OF EXPERTS IN FORENSIC PATHOLOGY AND FORENSIC ODONTOLOGY.
8. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING TESTIMONY BY DR. MICHAEL WEST.
9. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING *896 TESTIMONY BY DR. PAUL MCGARRY.
10. THE TRIAL COURT ERRED IN REFUSING A CONTINUANCE FOR DEFENSE COUNSEL TO INTERVIEW DR. PAUL MCGARRY AFTER THE PROSECUTION PROFFERED EXPERT OPINION THAT HAD NOT BEEN PROVIDED IN DISCOVERY.
11. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING TESTIMONY BY DR. HENRY MAGGIO.
12. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A CONTINUANCE.
13. THE PROSECUTION'S PEREMPTORY STRIKES OF JURORS HOLLOWAY, CURRY, AND ROBERTSON VIOLATED BATSON V. KENTUCKY.

14. THE TRIAL COURT'S STRIKE OF JUROR DEXTER RUSSELL WHO STATED HE COULD GIVE THE DEATH PENALTY WAS ERROR.
15. THE COURT ERRED IN FAILING TO GRANT DEFENDANT'S CHALLENGE FOR CAUSE OF A JUROR WHO FELT STRONGLY THAT A PERSON CONVICTED OF MURDER AND RAPE SHOULD GET THE DEATH PENALTY.
16. THE TRIAL COURT ERRED IN OVERRULING THE CHALLENGE FOR CAUSE FOR A JUROR WHO STATED SHE COULD NOT BE FAIR.
17. THE TRIAL COURT'S EXCUSALS FOR CAUSE WERE ERROR.
18. EXECUTION OF A DEFENDANT ABSENT A FINDING OF MENS REA IS UNCONSTITUTIONAL.
19. THE TRIAL COURT ERRED IN ITS DEFINITION OF THE AGGRAVATING CIRCUMSTANCE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL."
20. THE TRIAL COURT ERRED IN REFUSING INSTRUCTION D-3 AT SENTENCING.
21. THE INTRODUCTION OF NUMEROUS GRUESOME PHOTOGRAPHS WAS ERROR.
22. THE DISTRICT ATTORNEY ABUSED HIS DISCRETION IN SEEKING THE DEATH PENALTY AGAINST HENRY LEE HARRISON, A BLACK, FOR THE MURDER OF APRIL TURNER, A WHITE.
23. THE NUMEROUS INSTANCES OF CHARACTER EVIDENCE OF THE VICTIM REQUIRE REVERSAL OF THE DEATH SENTENCE.
24. HENRY HARRISON'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE PROSECUTION'S RELIANCE ON EXTRAJUDICIAL "LAW."
25. THE IMPROPER ARGUMENT BY THE PROSECUTION WARRANTS REVERSAL IN THIS CAUSE.
26. THE JURY'S FINDING THAT THE VICTIM WAS RAPED WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
27. THE ERRORS TAKEN TOGETHER ARE CAUSE FOR REVERSAL.
28. THE PROSECUTION COMMITTED REVERSIBLE ERROR IN COMMENTING IN CLOSING ON DEFENDANT'S DECISION NOT TO TESTIFY.
The district attorney in this case failed to disclose certain critical evidence to the defense as required by the Mississippi Uniform Criminal Rules of Circuit Court Practice. When the "surprise" evidence was admitted at trial, the lower court refused to follow the procedures adopted by this Court for remedying such problems. This Court can only conclude that these errors denied Harrison a fair trial. Therefore, we have no choice but to reverse his conviction and sentence.
The evidence withheld from the defense was in the form of expert opinion testimony, and was the only proof offered on the issue of rape, a necessary element of the offense charged in the indictment. Under these circumstances, it was also error for the lower court to refuse Harrison's request for an expert to aid in his defense.
*897 Finally, although ultimately rejecting Harrison's claim, the issue of involuntary medication of a defendant may arise when Harrison is retried. Accordingly, we address that issue in light of recent federal decisions. The numerous issues raised by Harrison but not addressed in the body of this opinion lack merit and do not warrant discussion.

STATEMENT OF THE FACTS
On Saturday, September 2, 1989, seven year-old April Sherry Turner was riding her bicycle with a friend in Gautier, Mississippi. The two children rode to a nearby convenience store and April went inside. Henry Lee Harrison, the appellant, was outside the store. According to the other little girl, when April came out and got on her bicycle, Harrison chased her out of sight. April did not come home that night. On September 3, 1989, searchers found April's nude, mutilated body in a wooded area close to the neighborhood where she lived. The child's bloody shirt was knotted tightly around her neck.
As part of the murder investigation, the body of April Turner was examined by forensic pathologist, Dr. Paul McGarry. Upon removing the knotted shirt, Dr. McGarry observed thirty-six stab wounds to the child's deeply indented neck and throat. He observed six more stab wounds on her forehead and one behind her left ear. Some of the wounds appeared to have been made by a sharp instrument while others exhibited a "star-shaped crisscross" configuration. In addition to the stab wounds, Dr. McGarry documented a deep curved laceration of the child's forehead above her right eyebrow. This wound displayed swelling and hemorrhaging indicating that April was alive when the blow fell. The doctor next noted extensive bruising of the head and face and extensive abrasions over the back of the body. The child's genital area had been subjected to a "massive penetrating tearing injury" so severe that nothing separated her vagina from her rectum. Finally, the doctor noted extensive rubbing type abrasions on the outside and the inside of the lips.
Upon being called by the State at trial and after being qualified as an expert witness, Dr. McGarry offered several opinions based on the injuries he had observed. He believed that some of the stab wounds were caused by something with a long tapering point and sharp edges. The curved laceration above April's eye was consistent with a downward blow from the blood-stained metal canister recovered by authorities. Finally, Dr. McGarry offered his opinion that April's vaginal and anal injuries were caused by the forceful penetration of a penis. Thus, he concluded that despite the lack of positive tests for semen, April Turner was raped before being murdered.
In addition to the above opinions on the causes of the victim's various injuries, Dr. McGarry offered expert testimony to the effect that April Sherry Turner was alive and conscious at the time the injuries were inflicted. His opinion was that strangulation was the cause of death.
McGarry and law enforcement officers noted wounds on the body of April Turner that appeared to be bite marks. Accordingly, the child's body was examined by Dr. Michael West, a forensic odontologist. At trial Dr. West was called by the State to testify to the injuries he discovered and the possibility that they were caused by the defendant. His method was to directly compare study models of Harrison's teeth to the wounds on the victim. Harrison was found to exhibit a number of highly distinctive dental characteristics. For example, he was missing a central incisor on his upper jaw, and he had only two of the typical four lower incisors. Dr. David Bonderer, a dentist who participated in making models of Harrison's teeth testified that the defendant's particular dental configuration was "very unique."
Dr. West photographed and videotaped the correlations he found. Some of the photographic and videotape comparisons were introduced as exhibits to his testimony. West testified that he was able to identify over forty-one bite marks on the body that were inflicted by Harrison. They were located "from her head to her ankle, front, backside, rear; completely covering the body." No bite marks were found that were inconsistent with the teeth of the defendant. Additionally, West testified that in his opinion, some of the bites were inflicted while the victim was *898 alive and responsive while others occurred while she was unconscious or dead.
Deborah Haller, a forensic serologist employed by the Mississippi Crime Laboratory examined several items submitted in connection with the investigation of the death of April Turner. She testified that both external and vaginal swabs tested negative for presence of seminal fluid. She further testified that oral and esophageal swabs tested positive for two components of semen. According to Haller, the presence of these substances strongly indicated but did not confirm the presence of semen. Based on this and other evidence presented at trial, Harrison was convicted and sentenced to death.

DISCUSSION

10. THE TRIAL COURT ERRED IN REFUSING A CONTINUANCE FOR DEFENSE COUNSEL TO INTERVIEW DR. PAUL MCGARRY AFTER THE PROSECUTION PROFFERED EXPERT OPINION THAT HAD NOT BEEN PROVIDED IN DISCOVERY.
Discovery in criminal cases is governed by Rule 4.06 of the Mississippi Uniform Criminal Rules of Circuit Court Practice which provides, in pertinent part, as follows:
(a) Upon written request by the defendant, the prosecution shall disclose to each defendant or to his or her attorney, and permit him or her to inspect, copy, test, and photograph, without the necessity of court order, the following which is in the possession, custody or control of the State, or the existence of which is known, or by the exercise of due diligence may become known, to the prosecution:
.....
(4) Any reports or statements of experts, written, recorded or otherwise preserved, made in connection with the particular case, and the substance of any oral statement made by any such expert;

Rule 4.06(a)(4), Mississippi Uniform Criminal Rules of Circuit Court Practice (emphasis added).
Failure to strictly comply with Rule 4.06 is not necessarily fatal:
When confronted with an alleged Rule 4.06 violation, this Court must review the record to determine whether the judge followed the guideline enunciated in Box v. State, 437 So.2d 19, 22-26 (Miss. 1983) (Robertson, J. specially concurring) (now codified in Rule 4.06(i):
1. Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2. If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3. If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.
Holland v. State, 587 So.2d 848 (Miss. 1991).
"Rule 4.06 and the Box guidelines are designed to avoid `ambush' or unfair surprise to either party at trial." Holland, 587 So.2d at 866-67.
Prior to the trial, Harrison filed a motion, pursuant to Rule 4.06 requesting disclosure of, "All reports of statements of experts made in connection with this case." Harrison later filed a motion to compel the State to come forward with the evidence required under Rule 4.06. The State responded only by providing a copy of Dr. McGarry's autopsy report, which did not state any opinion as to the instruments that caused the victim's injuries.
At trial Dr. McGarry was allowed to offer a number of opinions on the possible causes of certain injuries and their temporal relationship to the victim's death, despite the clear failure to provide this evidence to the defense. He further stated that April Turner was conscious when certain injuries were *899 inflicted. Most significantly, the undisclosed opinion of McGarry that April Turner was raped was the only evidence offered to prove this critical aspect of the State's case. As the following passage from the trial record shows, the trial court overruled all objections based on inadequate discovery responses and denied defense counsel's attempts to invoke the procedures set out in Box:
By Mr. Fortner: The testimony they are about to elicit is of a highly prejudicial nature in this case, and they have never told us about it, and we are objecting to it.
By the Court: Overruled.
By Mr. Fortner: We would ask the Court under the rules of discovery to give us a recess to talk to Dr. McGarry. The rules mandate that procedure to the Court.
By the Court: Bring the Jury in.
By Mr. Fortner: Excuse me, Your Honor. I need to finish asking you this. The rules of discovery now dictate in this type of situation where Dr. McGarry is about to testify to opinions never disclosed to the Defense that the Court is mandated to grant the Defense a recess to interview Dr. McGarry and ascertain what opinions he will testify to, and then come back and make an announcement to the Court as to whether or not the Defense is ready to proceed, at which point the Court has a duty to consider certain options. I'm asking for a recess to allow us to consult with Dr. McGarry and find out what expert opinions he is intending to testify to and the basis of those opinions.
By the Court: That's overruled.
By Mr. Burdick: Just for the record, Mr. Fortner was given notice of Dr. McGarry's being a witness months ago.
By Mr. Fortner: This is a violation of due process, an absolute violation of due process. Whatever Mr. Burdick just said in the record, Mr. Fortner and the Defense were never ever informed that Dr. McGarry was going to render these types of opinions. May I ask Dr. McGarry a couple of questions?
By the Court: No, we are going to bring the Jury in.
By Mr. Fortner: I need to make a proffer of proof, and I'd like to ask Dr. McGarry some questions.
By the Court: Bring the Jury in.
By Mr. Fortner: Are you denying me a right to make a proffer of proof, Your Honor?
By the Court: We are going on with the testimony.
By Mr. Fortner: Can I make a proffer of proof, Your Honor?
By the Court: Not now.
On appeal, Harrison contends that the lower court erred by not complying with the procedures set out in Box. The State conceded in its brief and at oral argument that the specific opinions objected to were not included in the autopsy report provided to the defense. Nevertheless, the State contends that the responses provided to Harrison were sufficient to satisfy Rule 4.06. The State points out that for some months prior to the trial, Harrison knew that McGarry would testify and also had a copy of the doctor's autopsy report, yet Harrison made no effort to question the pathologist.
The State cites Holland v. State, 587 So.2d 848 (Miss. 1991), in support of its contention that this was enough to place Harrison on notice that such opinions would be elicited at trial, and therefore, sufficient to meet the requirements of Rule 4.06. The Holland Court was faced with expert testimony related to the timing and sequence of a victim's injuries, the substance of which was not disclosed before trial. In addressing this issue, the Court stated:
Applying the law to facts, this Court concludes that Holland's contention is devoid of merit. The State provided Holland with McGarry's autopsy report and disclosed that McGarry would be called to testify. This should have sufficed to place Holland on notice of potential line of questioning by the State. Indeed, in the section of the report entitled "Provisional Autopsy Diagnosis," McGarry revealed his opinion on the general "time" of injuries (i.e., "Recently stretched lacerated abraded vaginal orifice, recently stretched abraded anus [and r]ecent mutilating cuts of the *900 genital region, postmortem"). Notably, Holland conceded during the hearing on his motion that the autopsy report "does mention" a "time element." Vol. XII, at 2087-88. It would seem to go without saying that the State might delve into this matter at trial and ask McGarry to expound upon this "time element" in a more specific manner. Albeit Holland was not duty-bound to interview or interrogate McGarry prior to trial, his failure to do so is somewhat surprising  particularly in view of the fact that a pathologist's testimony in a case like this one would be critical to the State's case and detrimental to the defense's. Cf. Whitington v. State, 523 So.2d 966, 976 (Miss. 1988) ("defense was given complete access" prior to trial to Dr. McCormick, the pathologist who performed an autopsy on the victim). In sum, Holland seems to have expected too much from the State. Accord Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all ... investigatory work on a case.").
Holland, at 867 (emphasis in original).
Holland supports the State's position only in that it demonstrates how compliance with the procedures set out in Box can cure some discovery violations. In Holland the trial Judge afforded the defense an "unlimited opportunity" to interview the State's expert. Id. No such opportunity was given to Harrison, as no attempt was made to comply with Box. This Court cannot countenance or condone the willful withholding of crucial evidence during discovery nor the flagrant disregard of the remedial measures established in Box. Accordingly, Harrison's conviction and sentence must be reversed. This is not to say that we are blind to the fact that Harrison's counsel exploited the prosecution's mistake by not using every means at his disposal to obtain the opinions of Dr. McGarry. This is especially true in light of the content of the autopsy report furnished to the defense well in advance of trial. Had the lower court complied with the requirements of Box, we would no doubt reach the same conclusion as we did in Holland.

7. HENRY LEE HARRISON WAS IMPROPERLY DENIED FUNDS TO RETAIN THE ASSISTANCE OF EXPERTS IN FORENSIC PATHOLOGY AND FORENSIC ODONTOLOGY.
On May 23, 1990, defense counsel filed a motion requesting funds to hire a forensic odontologist because "the ability of the defense to confront the testimony of Dr. West [the State's forensic odontologist] and to present rebuttal testimony is critical to the adequate preparation and presentation of the defense." The motion provided the name of Dr. Harry Menser, a forensic odontologist, along with information related to his standard fees. On May 25, 1990, defense counsel moved the lower court to provide funds to the defendant to retain a pathologist. This motion was based on the fact that the prosecution had retained a pathologist and, therefore, the defense would need one to assist in preparing cross-examination and in presenting the defendant's case. The motion provided the name and fee information for Dr. Gerald Liuzzo.
Defense counsel raised these motions at several hearings subsequent to filing them. Judge Maples consistently deferred ruling on the motions, instead encouraging Mr. Fortner to seek comparable experts from within the state. Finally, on June 1, 1990, three days before trial, the motions were overruled.
On appeal, Harrison argues that the ruling of the lower court denied him a fair trial and violated the precepts announced by the U.S. Supreme Court in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).
The State counters by arguing that Harrison had access to Dr. McGarry, the State's expert pathologist, and Dr. West, the State's expert odontologist, prior to trial and a full opportunity to cross-examine them at trial. According to the State, this was sufficient to satisfy the defendant's right to an expert under Ake and its progeny.
Even before the decision in Ake, Mississippi law provided for discretionary use of independent experts at state expense:
*901 That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare. [citations omitted]
As aptly stated in Oregon v. Acosta, 41 Or. App. 257, 597 P.2d 1282 (1979), p. 1284:
It is apparent that an indigent's statutorily enacted right to defense expenses is not absolute, but is conditioned upon showing that such expenses are needed to prepare and present an adequate defense. [.. .] There is no single test for determining whether the services of an investigator or an expert are necessary; that decision will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed.
Ruffin v. State, 447 So.2d 113, 118 (Miss. 1984) (quoted in Johnson v. State, 529 So.2d 577, 589-90 (Miss. 1988).
In a case addressing a defendant's right to a psychiatric expert, the United States Supreme Court stated:
We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, see Ross v. Moffitt, 417 U.S. 600 [94 S.Ct. 2437, 41 L.Ed.2d 341] (1974) it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," id. at 612 [94 S.Ct. at 2444]. To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," Britt v. North Carolina, 404 U.S. 226 [92 S.Ct. 431, 30 L.Ed.2d 400] (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them.
Ake, 470 U.S. at 77, 105 S.Ct. at 1093.
Ultimately, the Court held:
[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.
Ake, 470 U.S. at 83, 105 S.Ct. at 1096.
Mississippi, speaking through this Court, has implemented this right with the following rule:
This Court weighs on a case by case basis whether the denial of expert assistance for an accused is prejudicial to the assurance of a fair trial and will grant relief only where the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and where his trial was thereby rendered fundamentally unfair.
Johnson v. State, 529 So.2d 577, 590 (Miss. 1988); see also Hansen v. State, 592 So.2d 114, 125 (Miss. 1991) (on a showing of substantial need, request for assistance from pathologist may have merit).
Of course a defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial. See Butler v. State, 608 So.2d 314, 321 (Miss. 1992); Hansen v. State, 592 So.2d 114, 125 (1991); Griffin v. State, 557 So.2d 542 (Miss. 1990). The relative importance of the testimony offered by the State's experts is one factor to consider in assessing the fairness of the trial. Johnson, 529 So.2d at *902 591; see also, Pinkney v. State, 538 So.2d 329 (Miss. 1988) (defendant not entitled to mental health experts where sanity was not "significant factor" at trial).
Returning to the facts of the current case, there can be little doubt that the expert testimony, at least that of Dr. McGarry, was very important to the State's case. McGarry took the stand and offered, over the defendant's objection, the opinion that the victim's vaginal injuries could only have been caused by a human penis. As the prosecution pointed out in closing argument, the expert's opinion was the only evidence on the issue of rape, a critical element of the capital murder charge. Although defense counsel attempted to counter the testimony of the State's expert by arguing that, from a commonsense standpoint, this conclusion was dubious, the prosecutor quickly pointed out, "What Mr. Fortner said is not evidence."[1]
The lower court's denial of the pretrial motion for funds may not have risen to the level of abuse of discretion. The motions and arguments presented by defense counsel did little to distinguish Harrison's case from the general situation where access to experts is not necessary. This failure on the part of defense counsel was understandable, however, given the State's failure to comply with Rule 4.06, as discussed supra. Without full appreciation of the substance of McGarry's testimony, Harrison was unable to impress upon the lower court the importance of access to an independent expert.
Once the trial developed as it did, however, with the State's expert offering the only evidence on the crucial element of rape, fundamental fairness required that Harrison be provided an expert in pathology to rebut the testimony of McGarry[2]. At that point, no amount of lay testimony could have possibly refuted the "objective" opinion of the State's expert. Due process and fundamental fairness required the lower court to allow the defense access to an independent pathologist and sufficient time to rebut or order a mistrial. Failure to do so constitutes reversible error.

5. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING THE PROSECUTION'S MOTION TO ADMINISTER ANTI-PSYCHOTIC MEDICATION TO HENRY LEE.
Because Harrison withdrew his insanity defense prior to trial, we ultimately find that this assignment of error is without merit. To the extent that recent federal decisions in this area are not entirely clear and in view of the fact that this case is being reversed on other grounds and similar issues may arise upon retrial, we provide the following analysis as a guide to those faced with similar issues in the future.
On February 1, 1990, the lower court conducted a hearing on a Motion to Administer Antipsychotic Medication filed that same day by the prosecution. Dr. Cepeda had previously prescribed the psychotropic drug Haldol for treatment of Harrison. However, while incarcerated at the Adult Detention Center in Jackson County, Harrison had begun *903 to spit out his oral medication. On January 23, 1990, he was forcibly injected with Haldol by the nurse at the A.D.C. and shortly thereafter the State's motion was filed. The defense cross-examined the State's witnesses, but presented no witnesses in opposition. Judge Maples ruled in favor of the State, authorizing continued injections of Haldol with or without the consent of the defendant.
On appeal Harrison asserts that his forced medication violated various constitutional rights by altering his natural demeanor, depriving him of his insanity defense, and depriving him of his right to present mitigating evidence at the sentencing phase. In his reply brief, Harrison also argues that this issue is controlled by the recently decided case, Riggins v. Nevada, 504 U.S. ___, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). In Riggins, the Court reversed a capital murder conviction on the grounds that forced administration of the antipsychotic drug Mellaril, without certain requisite, but unspecified findings, violated the defendant's constitutional rights.
The State counters by arguing that the objection to forced medication stated into the record by the defense was "merely perfunctory." The State claims that since defense counsel's objection stated no basis and none was clear from the context, Harrison is barred from raising the issue on appeal. The State makes no effort to address the application of Riggins to this case.
Obviously if the State is correct in its contention that this assignment is waived for lack of a sufficient contemporaneous objection, then any potential merit is irrelevant. This Court has held that, "if no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Russell v. State, 607 So.2d 1107 (Miss. 1992); Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Irving v. State, 498 So.2d 305, 319 (Miss. 1986). However, the Court does have the prerogative in death penalty cases of relaxing the contemporaneous objection and plain error rules when justice so requires. Hansen v. State, 592 So.2d 114, 142 (Miss. 1991) (procedural niceties give way to the search for substantial justice); Williams v. State, 445 So.2d 798 (Miss. 1984) cert. denied 469 U.S. 1117, 105 S.Ct. 803, 83 L.Ed.2d 795 (1985); Culberson v. State, 379 So.2d 499, 506 (Miss. 1979).
In the present case, defense counsel did object but stated no particular reason:
BY MR. FORTNER: The only other request I have, it is obvious to me that the Court is going to sign an order authorizing the A.D.C. to inject medication into my client.
BY THE COURT: I haven't made that decision until I hear from you, Tom.
BY MR. FORTNER: We, of course, will object to that. But if you intend to do so, we would ask the Court to order the A.D.C. to on the day they intend to inject the medication to call me and let me go out there. I don't think they will have nearly the problem if I'm there with Henry than if I'm not there with Henry.
(emphasis added).
This Court has considered issues first raised on appeal where a fundamental right was involved. See Willie v. State, 585 So.2d 660, 666 (Miss. 1991); Gray v. State, 549 So.2d 1316, 1321 (Miss. 1989). This review has been accomplished by use of the so-called "plain error" rule. This Court has also implied on at least one occasion that recognition of a "new right" subsequent to the trial would excuse counsel's failure to raise a particular issue. Irving v. State, 498 So.2d 305, 319 (Miss. 1986).
Furthermore, where a general objection is raised, as in this case, failure to state a specific basis is excusable where the basis is clear from the context. Murphy v. State, 453 So.2d 1290, 1293 (Miss. 1984). In Murphy we stated:
In such circumstances it would be vain and foolish to demand that in the heated flow of trial, where the grounds of the objection are reasonably apparent from the context, that counsel state his grounds or waive his objection.
Id.
We conclude that consideration of this issue is proper, not because of the "heightened *904 scrutiny" or "death is different" argument, but because the issue in question presents a potential violation of constitutionally protected rights, recently addressed by the United States Supreme Court, and because it is unquestionably clear from the context as preserved in the record that the objection lodged by defense counsel was based on the rights safeguarded by the Fifth and Sixth Amendments and applicable to this case via the Fourteenth Amendment.
Proceeding to the merits, at the hearing, the State called Larry Eggers, a case manager at Singing River Mental Health Services, who testified that, "it would be in the best interest of any schizophrenic to stick with his medication." Eggers further testified that he had recently observed Harrison in an abnormally agitated state.
Molly Pemberton, a registered nurse employed by the Jackson County Sheriff's Office to provide care for prisoners, testified that Harrison refused his medication for a period of two weeks. During this time he grew increasingly agitated and "hit an officer over the head." At this point, according to Pemberton, Dr. Cepeda decided to treat the defendant with an injectable form of Haldol with a twenty-eight day duration. On January 23, 1990, Pemberton "took four officers in there and told him, `Henry, you are going to take this shot whether you want to or not.'" The February motion was brought to insure that future injections could be administered regardless of Harrison's desire to be medicated.
At the close of the State's presentation in support of the motion, counsel for the defense called no witnesses. After a brief discussion of other pending motions, the following ruling issued from the bench:
Well, I feel like this: I feel like based upon the evidence that's been presented here, that he has not cooperated fully with the medical personnel out there in taking his medication. And I feel like they should be authorized to do whatever is necessary to see that he receives proper medication. And I will also ask the personnel, if they will, when they get ready to do the injections  if they have to, if he doesn't cooperate with them  that they can call Mr. Fortner.
An appropriate order was drafted and signed and Haldol injections were administered to Harrison from that point on throughout his trial.
The U.S. Supreme Court has recently addressed the issue of forced medication of criminal defendants in Riggins v. Nevada, 504 U.S. ___, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). Having lost before the highest Nevada state court, David Riggins appealed his murder and robbery convictions and his death sentence, to the Supreme Court claiming that Nevada unconstitutionally forced an antipsychotic drug upon him during trial. The Supreme Court reversed "because the Nevada courts failed to make findings sufficient to support forced administration of the drug." 504 U.S. at ___, 112 S.Ct. at 1812, 118 L.Ed.2d 479 at 485.
The facts in Riggins are slightly different than those in the current case. In Riggins the State drugged the defendant without an authorizing order. Prior to trial, the defense moved for termination of the involuntary medication and the State opposed. The trial court denied the motion without stating a reason. On appeal the Supreme Court of Nevada affirmed. The court first noted that the defendant's demeanor has probative value where sanity is in issue. Ultimately, the Nevada court held that expert testimony offered at trial on the effect of the drug was an adequate substitute for allowing the jury to observe the defendant's unmedicated demeanor. Riggins v. State, 107 Nev. 178, 180, 808 P.2d 535, 537 (1991).
On appeal the U.S. Supreme Court reversed for lack of "findings sufficient to support forced administration of the drug." The Court, however, found:
no occasion to finally prescribe such substantive standards as mentioned above, since the [Nevada trial court] allowed administration of Mellaril to continue without making any determination of the need for this course or any findings about reasonable alternatives.
Riggins, 504 U.S. at ___, 112 S.Ct. at 1811, 118 L.Ed.2d at 490 (emphasis in original).
*905 Thus, although the case absolutely mandates that certain findings be made, it does not enlighten as to exactly what those findings must be. The U.S. Supreme Court begins its analysis with the following statement:
Taking account of the unique circumstances of penal confinement, however, we determined that due process allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." [Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)]
Under Harper, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial. See Bell v. Wolfish, 441 U.S. 520, 545, 60 L.Ed.2d 447, 99 S.Ct. 1861, 1877 (1979) ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"); O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 96 L.Ed.2d 282, 107 S.Ct. 2400, 2404 (1987) ("[P]rison regulations ... are judged under a `reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights"). Thus, once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug.

504 U.S. at ___, 112 S.Ct. at 2404, 118 L.Ed.2d at 488 (emphasis added).
After hinting that danger and medical appropriateness would justify forced medication of a convicted prisoner, the Court offered two examples where medication of a defendant would be justified:
Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated and the District Court had found that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. See Harper, supra, at 225-226, 108 L.Ed.2d 178, 110 S.Ct. 1028; cf. Addington v. Texas, 441 U.S. 418, 60 L.Ed.2d 323, 99 S.Ct. 1804 (1979) (Due Process Clause allows civil commitment of individuals shown by clear and convincing evidence to be mentally ill and dangerous). Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means. See Illinois v. Allen, 397 U.S. 337, 347, 25 L.Ed.2d 353, 90 S.Ct. 1057 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of `ordered liberty' and prerequisite to social justice and peace"). We note that during the July 14 hearing Riggins did not contend that he had the right to be tried without Mellaril if its discontinuation rendered him incompetent. See Record 424-425, 496, 500. The question whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial is not before us.
Riggins, 504 U.S. at ___, 112 S.Ct. at 1815, 118 L.Ed.2d at 489-90 (emphasis added).
Both these examples strongly imply that a third finding of no less intrusive alternative is required before forced medication prior to conviction is permissible. The Court concluded:
Because the record contains no finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy, however, we have no basis for saying that the substantial probability of trial prejudice in this case was justified.
Riggins, 504 U.S. at ___, 112 S.Ct. at 1817, 118 L.Ed.2d at 491 (emphasis added).
Today we recognize the sound reasoning of the Riggins decision and extend it to its natural conclusion. Specifically, we hold that involuntary treatment of the criminally *906 accused with antipsychotic medication is permissible only where medically appropriate and, considering less intrusive alternatives, essential for safeguarding a compelling state interest.
Returning to the current case, we note that although Harrison was medicated without the requisite findings, any potential prejudice was eliminated when he withdrew his insanity defense. Thus, this assignment of error is without merit and we need not go further in addressing his claim.

CONCLUSION
The State in this case violated long-established rules of discovery by not supplying Harrison with the substance of the opinion testimony to be offered by Dr. McGarry. The violation standing alone would not require reversal, but justice requires that the defendant be afforded an opportunity to counter surprise evidence consistent with the Box guidelines. The lower court refused to follow the procedures set forth by this Court, and accordingly, Harrison's conviction and sentence must be reversed and the cause remanded for a new trial.
Furthermore, once the full import and significance of the McGarry's testimony was apparent, it was error for the lower court to refuse Harrison's request for an independent pathologist to refute the State's expert. Finally, we point out that certain findings must be made by the trial judge on the record before a defendant can be involuntarily medicated with psychotropic drugs.
HARRISON'S CONVICTION OF CAPITAL MURDER IS REVERSED, SENTENCE OF DEATH IS VACATED, AND THIS CASE IS REMANDED TO THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI, FOR A NEW TRIAL OR OTHER DISPOSITION NOT INCONSISTENT WITH THIS OPINION.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
NOTES
[1] The full text of this portion of the prosecutor's argument demonstrates the advantage given to the State by the lower court's refusal to allow Harrison access to an independent pathologist:

BY MR. KOSKELA: Ladies and gentlemen, I will touch on a couple of points. Dr. McGarry  Mr. Fortner seems to be hinging his case on not proving rape. Dr. McGarry said the tearing and the ripping apart was done by a penis. This is the only evidence we have in this case. What Mr. Fortner said is not evidence. What I say is not evidence. What Mr. Burdick says is not evidence, but the evidence that comes from the witness stand. You told me Tuesday morning you would listen to the evidence and apply the laws. We would hope you would do that. You have a duty to the Court that you will do this. All you have to do is consider the evidence that was presented here. There is no evidence to the contrary. It is specifically clear. Dr. Paul McGarry said that due to the fact that she lost so much blood, he wouldn't be surprised that there wasn't any semen found in the vaginal area. And Mr. Burdick asked him specifically because none were found, would that change your opinion. He said no, it was rape beyond a doubt. I submit to you it was rape. I submit to you that we proved a case of rape, we proved a case of murder, and by the law that's capital murder.
[2] Such rebuttal testimony was apparently available as Harrison submitted an affidavit from Dr. Liuzzo with his appeal that stated, among other things, that a pathologist cannot determine to a reasonable medical certainty that a given injury could only have been caused by a human penis.