# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CT-01612-SCT

*NORRIS ALEXANDER a/k/a NORRIS CRAWFORD
ALEXANDER a/k/a BUGGER*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/2019 |
| TRIAL JUDGE: | HON. JAMES McCLURE, III |
| TRIAL COURT ATTORNEYS: | RONALD W. LEWIS |
| | JAMES STEPHEN HALE, JR. |
| | TOMMY WAYNE DEFER |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | ZAKIA BUTLER |
| | ERIN BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE PANOLA COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED - 02/10/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BEAM, JUSTICE FOR THE COURT:**

¶1.     The Mississippi Court of Appeals vacated Norris Alexander's life-without-parole

sentence as a habitual offender under Mississippi Code Section 99-19-81 (Rev. 2020).

*Alexander v. State*, No. 2019-KA-01612-COA, 2021 WL 671340, at *1 (Miss. Ct. App. Feb. 22, 2021).  The Court of Appeals held that the Panola County Circuit Court erred by denying Alexander's motions for funds to hire a mitigation investigator and an adolescent-development psychologist for his *Miller v. Alabama*[1] hearing.  The State petitioned this Court for certiorari, which we granted.

¶2.     Finding that the trial court did not abuse its discretion by denying the motions for expert funding, we reverse the Court of Appeals' decision, and we reinstate and affirm the trial court's sentencing order.

## FACTS AND PROCEDURAL HISTORY

¶3.     In 1998, a Panola County jury found Alexander guilty of capital murder for stabbing his mother-in-law to death in 1993.  Alexander was seventeen years old at the time of the killing.  He and his wife, along with their young child had previously lived with his wife's mother, Catherine Blevin.  Blevin kicked them out of her home a few months before the killing after she discovered marijuana plants growing in their bedroom. *Alexander v. State*, 759 So. 2d 411, 414 (Miss. 2000).

¶4.     Prior to his capital-murder trial, Alexander was twice convicted in 1997 of selling marijuana.  At sentencing following the capital-murder conviction, the trial court found that Alexander was a habitual offender under Mississippi Code Section 99-19-81 (Rev. 1994) based on the two prior felony convictions and sentenced him to life imprisonment without

---

[1]*Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

parole. *Alexander*, 759 So. 2d at 414. This Court affirmed the conviction and sentence on direct appeal. *Id.* at 422.

¶5. In 2014, this Court granted Alexander's application for leave to proceed in the trial court with his post-conviction relief (PCR) request based on *Miller*, 567 U.S. at 460. Order, *Alexander v. State*, No. 2008-M-00765 (Miss. Dec. 4, 2014).

¶6. The trial court entered an order in July 2015 vacating Alexander's sentence and appointed a public defender to represent Alexander for a *Miller* hearing, which was set for August 31, 2015. A number of continuances were granted in the matter. Alexander later retained private counsel, who filed two separate motions in the trial court requesting $10,000 to hire a mitigation investigator and $30,000 to hire an adolescent-developmental-psychology expert.

¶7. A hearing was held on March 31, 2016. The State and defense counsel had stipulated that the trial court should resentence Alexander to life with the possibility of parole on his capital-murder conviction because the sentencing statute for capital murder in 1993 allowed only for either the death penalty or a life sentence.[2] The State submitted, however, that it intended to prove that Alexander was a habitual offender for purposes Section 99-19-81 and would seek life without parole.

¶8. Alexander asserted that his habitual-offender status was irrelevant because *Miller* nullified the mandatory sentence of life without parole as a habitual offender—as applied to

---

[2] Mississippi Code Section 99-19-101 was amended in July 1994 to allow life without parole sentences. The State elected not to seek the death penalty at Alexander's capital-murder trial based on the family's wishes.

3

juveniles. Alternatively, Alexander asserted that he was entitled to an individualized hearing before a jury on the habitual-offender sentence, with consideration of the *Miller* factors.

¶9. Following the hearing, the trial court entered an order in June 2016 denying the motion to resentencing Alexander to life with the possibility of parole and denying the motion for resentencing by a jury. The trial court ruled that the matter should be set for a *Miller* hearing to determine whether Alexander should be sentenced to life without parole under Section 99-19-81 or life with parole despite his habitual-offender status.

¶10. The trial court noted in the June 2016 order that the parties had made no arguments on the motions for expert funds. The trial court instructed the State to file a written response to the motions within ten days of the order and instructed both parties to notify the trial court if they desired oral argument on the motions. If no oral argument was required, the trial court said it would enter an order on the motions after the ten-day period.

¶11. In July 2016, the trial court entered an order denying a motion for reconsideration of the June 2016 order, filed by Alexander. The trial court instructed the parties to contact the court administrator to obtain possible dates for the *Miller* hearing.

¶12. No further action was taken in the case until April 2018 when the court administrator contacted Alexander's attorney with dates for a hearing on the motions for expert funding. According to a *sua sponte* order issued by the trial court on March 27, 2019, Alexander's "attorney indicated he was working on an appeal and would contact the court administrator after the appeal was filed." But, at the time, the attorney had yet to contact the court. The

4

trial court then ordered the parties to confer and to contact the court administrator within fourteen days of the March 27 order to schedule a hearing on resentencing.

¶13.    The trial court entered an order on April 30, 2019, noting that Alexander's attorney had contacted the court administrator and "asked for hearing dates for the motions and assert[ed] that setting the re-sentencing would be premature." The trial court found that any request for oral arguments on the motions for expert funding had been waived. And the trial court denied Alexander's motions for expert funding. Relying on Mississippi law, the trial court found that Alexander had not established a substantial need for funds to hire the requested  mitigation investigator or the adolescent-developmental psychologist.

¶14.    The *Miller* hearing was held on September 24, 2019. The State called two witnesses: William Travis, the attorney who represented Alexander at his capital-murder trial, and Mark Whitten, a former Panola County Sheriff's deputy, who investigated the crime in 1993. Alexander presented no witnesses.

¶15.    Alexander's attorney argued at the hearing that the trial court's denial of his motion for an adolescent-development psychologist left him unprepared to address the *Miller* factors. So he asked the trial court to strike all of the *Miller* testimony, stating as follows:

> For the record, the [c]ourt entered an order earlier stating that I had waived the right to put on evidence of sort that we're talking about here today, and there was no known waiver by me. I actually had given the court administrator several dates that I was available for a hearing, and I never got a response. And I have found out since then that . . . was because the court administrator was ill, and so they didn't get set. But I would like to make the record that I did not come prepared to deal with the *Miller* factors, because I didn't have any evidence, because the [c]ourt denied my motion to have a psychologist, which might not have occurred had I known when to have her in court. She

5

was prepared to do so. But I just would ask the [c]ourt to strike all of this *Miller* testimony.

¶16. The trial court denied the request to strike. It ruled on the *Miller* factors from the bench and subsequently in a written order that same day. The trial court sentenced Alexander to life as a habitual offender under Section 99-19-81, without parole eligibility.

¶17. The trial court considered factors identified by the *Miller* Court, as interpreted and adopted by this Court in *Parker v. State*, 119 So. 3d 987, 995 (Miss. 2013)[3]: (1) chronological age and the hallmark features among that age; (2) family and home

---

[3] *Parker* explained that the *Miller* Court identified several factors that must be considered by the sentencing authority before sentencing a juvenile to life in prison without parole:

Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. *See, e.g.*, *Graham* [*v. Florida*], 560 U.S. [48], 130 S. Ct. [2011,] 2032[, 176 L. Ed. 2d 825 (2010) ] ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J.D.B. v. North Carolina*, 564 U.S. [261, 269], 131 S. Ct. 2394, 2400-01, 180 L. Ed. 2d 310 (2011) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Parker*, 119 So. 3d at 995-96 (quoting *Miller*, 567 U.S. at 477-78).

6

environment; (3) circumstances of the offense; (4) ability to deal with the legal system; (5) and possibility of rehabilitation.

**1. Alexander's chronological age:** The trial court found that unlike the fourteen-year-old defendants in *Miller*,[4] Alexander was seventeen, married, and had a child. Testimony showed that Alexander was a "typical 17-18 year old and not immature with law enforcement and the criminal process." Nor was he unable to appreciate risks and consequences. Because Alexander put on no proof, no "psychological or educational test scores" were available.

**2. Alexander's Family and home environment:** "By all accounts," the trial court said, "Alexander came from a good family." Testimony showed that he was "living with his mother-in-law, the victim, and his wife, when the victim found marijuana growing in the home and kicked [him] and his wife out of the home."

**3. Circumstances of the offense (participation and pressure):** The trial court found that the evidence showed that Alexander acted alone, cutting the victim's phone lines and stabbing her in the throat. By the time Alexander was indicted, he was twenty-one. No evidence was presented that Alexander had succumbed to any type of peer pressure.

**4. Alexander's abilities to deal with the legal system and assist counsel:** Evidence was presented by Alexander's defense counsel from the murder trial that Alexander had no problems assisting in his defense and had the ability to deal with the police officers involved

---

[4] *Miller* involved two companion cases, *Miller v. Alabama* and *Jackson v. Hobbs*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Both involved petitioners who were age fourteen at the time they committed homicides that resulted in life-without-parole sentences. *Miller*, 567 U.S. at 465-69.

in the case. Evidence was presented that Alexander was not unfamiliar with law enforcement and the criminal process.

**5. Rehabilitation:** According to the trial court, Alexander showed no signs of rehabilitation. Documentation presented showed that he had been indicted for multiple felonies while in jail, and he is still committing criminal activity.

**6. Additional considerations:** The trial court further found that in contrast to the defendants in *Miller*, Alexander was seventeen (not fourteen) at the time of the murder, he was the "lone attacker" (not a "culpable spectator"), and he had a "good home" (not an abusive one). *Cf. Miller*, 567 U.S. at 465-69.

¶18. The trial court concluded, "It is hard to imagine many realistic situations where the factors would weigh more heavily against a defendant than they do in the case at hand." In construing the *Miller* decision itself, the trial court noted that the majority in *Miller*, responding to the *Miller* dissenters said that individualized sentencing would allow the sentencing court to consider the various situations of concern voiced by the dissenters.[5]

---

[5] Although the trial court did not specifically cite to the portion of *Miller* to which it was referring, it appears the trial court was referring to footnote eight for the *Miller* majority opinion, placed after the following sentence: "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at 480. After noting the dissenters' position, the footnote states:

> Our holding requires factfinders to attend to exactly such circumstances—to take into account the differences among defendants and crimes. By contrast, the sentencing schemes that the dissents find permissible altogether preclude considering these factors.

*Id.* n.8.

¶19.	The trial court then stated,

> Those specific scenarios include the deliberate murder of an innocent victim by a seventeen (17) year old as well as seventeen (17) year olds who commit the 'most heinous' offenses. Both scenarios exist in the case at hand. Nothing compelling under the *Miller* factors, has been presented in mitigation.

¶20.	Alexander appealed, and the case was assigned to the Court of Appeals. Alexander raised three issues: (1) the trial court erred by denying his motions for funds to retain expert assistance in the fields of mitigation investigation and adolescent-development psychology; (2) the trial court denied him due process by not resolving whether he was a rare, permanently incorrigible juvenile homicide offender; and (3) the trial court deprived him of his constitutional right to have a jury impose his sentence. The Court of Appeals addressed only the first issue, finding it dispositive.

¶21.	Applying *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), the Court of Appeals concluded that "lack of . . . expert assistance and the manner in which it affected the *Miller* hearing in this case denied Alexander due process, thereby rendering his hearing fundamentally unfair." *Alexander*, 2021 WL 671340, at *8. The Court of Appeals said that it was not holding that Alexander was entitled to all of the expert funds he requested or that he was entitled to both experts. *Id.* "Rather, instead of denying Alexander's motions altogether, the circuit court should have provided Alexander funds for an **adequate** expert to support his defense." *Id.*

¶22.	Writing for the dissent, Presiding Judge Carlton said, "Alexander failed to meet his burden of providing the circuit court with concrete reasons for requiring expert assistance[;] [i]nstead, Alexander offered 'only unsubstantiated assertions that [expert] assistance would

9

be beneficial.'" *Id.* at *9 (Carlton, P.J., dissenting) (third alteration in original) (quoting *Barnett v. State*, 192 So. 3d 1033, 1039 (Miss. Ct. App. 2015)). Accordingly, the dissent would have held that the trial court did not abuse its discretion in denying Alexander's motions for expert funds. *Id.* at *10.

## DISCUSSION

I.   **Whether the trial court erred by denying Alexander's motions for funds to retain expert assistance in the fields of mitigation investigation and adolescent-development psychology.**

¶23. We agree with the Court of Appeals dissenters. As the Court of Appeals majority reiterated, "[t]he question of whether a defendant has a right to [expert] funds is a question left to the sound discretion of the trial court." *Id.* at *5 (internal quotation marks omitted) (quoting *Moore v. State*, 287 So. 3d 905, 920 (Miss. 2019)). The determination of whether a defendant must be provided expert funding is made on a case-by-case basis. *Richardson v. State*, 767 So. 2d 195, 198 (Miss. 2000). "A defendant must demonstrate a substantial need in order to justify the trial court expending public funds for an expert to assist the defense." *Id.* (citing *Holland v. State*, 705 So. 2d 307, 334 (Miss. 1997)). This requires the defendant to "come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial." *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994) (citing *Butler v. State*, 608 So. 2d 314, 321 (Miss. 1992); *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991); *Griffin v. State*, 557 So. 2d 542 (Miss. 1990)).

¶24. This Court has "never held that expert testimony is required in a *Miller* hearing." *Moore*, 287 So. 3d at 920 (citing *Chandler v. State*, 242 So. 3d 65, 67-71 (Miss. 2018);

10

*Jones v. State*, 122 So. 3d 698, 699-703 (Miss. 2013); *Parker v. State*, 119 So. 3d 987, 989-91, 995-1001 (Miss. 2013)). "The determination of an offender's potential for rehabilitation under the *Miller* factors is left to the sentencing authority." *Id.* (citing *Chandler*, 242 So. 3d at 68-71; *Jones*, 122 So. 3d at 700-03; *Parker*, 119 So. 3d at 995-1001).

¶25. While we said in *Moore* that there may be a particular *Miller* case "in which expert testimony could be helpful and [expert funds] could be allowed," *id.* at 920, the record here demonstrates no such case to allow a reviewing court to overturn the trial court's decision to deny the funds. *See id.* (finding no abuse of discretion in the trial court's decision to deny defendant's request for expert funds to a hire a mitigation investigator).[6]

¶26. At the outset, this matter sat on the trial court's docket for almost four years from the time Alexander's attorney was retained until the time the *Miller* hearing was finally conducted. We reiterate that it is the party's responsibility to obtain a ruling from the trial court on any motions filed with the trial court. *Billiot v. State*, 454 So. 2d 445, 456 (Miss. 1984). Nothing was presented to the trial court other than what was submitted in Alexander's two motions requesting $10,000 for a mitigation investigator and $30,000 to hire an adolescent-development psychologist.

¶27. According to the respective motions , Alexander submitted the following reasons for a mitigation expert: (1) a "substantial amount of mitigating evidence" could be uncovered, especially for regarding his family and home environment;  (2) no mitigating circumstance

---

[6] Since we remanded the matter for resentencing before a jury, we said the defendant could again seek expert funds subject to the trial court's determination and discretion. *Moore*, 287 So. 3d at 920.

had been presented at the capital-murder trial because the only sentencing option available was life without parole; (3) "[a] social history investigation is not within the expertise of a lawyer"; (4) given Alexander's age at thirty-nine years old, "[e]very aspect of [his] life from conception to the present day must be investigated"; (5) Alexander's nearly twenty years of incarceration may complicate efforts to obtain relevant witnesses, documents, and other evidence; (6) since *Miller* likened life without parole for juveniles to the death penalty, the same American Bar Association guidelines for death-penalty cases should apply, instructing that a "mitigation specialist" is "indispensable" in such cases; and (7) Alexander is indigent and unable to afford a mitigation expert.

¶28. Alexander submitted the following reasons for a psychologist: (1) the sentencer would need "developmental expertise to consider relevant clinical information about Alexander's developmental status at age 17"; (2) the expert could "provide valuable general information about adolescent development and evaluate Alexander to form an opinion and testimony about his developmental characteristics relevant for mitigation"; (3) "[t]he expert would have the ability to discuss scientific research that support[s] the U.S. Supreme Court's presumptions [in *Miller* and other cases] about developmental immaturity of adolescents"; (4) though many of Alexander's records, including his psychological records, no longer exist, "a forensic development psychologist can look to school records, which do exist, as well as evidence of lengthy in-patient treatment in a psychological hospital, to piece together a portrait of Alexander in his adolescence"; and (5) the expert could "provide valuable

assistance to the court in answering questions about the impact of environment upon adolescent development."

¶29. We find that Alexander's reasons for needing expert funds never developed beyond the level of general speculation. Addressing the latter motion first, this Court has held that "[a] defendant is not entitled to a psychological expert where he has not raised insanity as a defense or where the State does not plan to submit psychological evidence against the defendant." *Simmons v. State*, 869 So. 2d 995, 1003 (Miss. 2004) (quoting *Bishop v. State*, 812 So. 2d 934, 939-40 (Miss. 2002)). Both *Simmons* and *Bishop* were death-penalty cases. The *Simmons* Court found no merit to the claim that defendant's trial counsel was ineffective for failure to procure a psychological or mitigation expert for sentencing. *Simmons*, 869 So. 2d at 1003-04. And the *Bishop* Court upheld the trial court's denial of a motion for funds to hire a psychological expert to develop psychological mitigation evidence for sentencing. *Bishop*, 812 So. 2d at 939-40.

¶30. The same holds true for *Miller* proceedings in general. After the Court of Appeals issued its decision in this case, the United States Supreme Court handed down *Jones v. Mississippi*, 141 S. Ct. 1307, 1311, 209 L. Ed. 2d 390 (2021). The Court in *Jones* said that individuals who commit homicides when under the age of eighteen "may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment." *Id.* at 1311 (citing *Miller*, 567 U.S. 460). "In a case involving an individual who was under 18 when he or she committed a homicide, a

13

State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." *Id.* at 1313.

¶31. The *Jones* Court then clarified its holdings in *Miller* and *Montgomery v. Louisana*, 577 U.S. 190, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016), reiterating again that "a separate factual finding of permanent incorrigibility is not required" by the sentencer. *Jones*, 141 S. Ct. at 1313 ("In *Montgomery*, the Court unequivocally stated that '*Miller* did not impose a formal factfinding requirement' and added that 'a finding of fact regarding a child's incorrigibility . . . is not required." (alteration in original) (quoting *Montgomery*, 577 U.S. at 211)).

¶32. The *Jones* Court agreed with the State on appeal that "permanent incorrigibility is not an eligibility criterion akin to sanity or a lack of intellectual disability." *Id.* at 1315. *Jones* noted that "th[is] Court has recognized that it 'is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 574, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)).

¶33. The *Jones* Court explained that "*Miller* declined to characterize permanent incorrigibility as such an eligibility criterion." *Id.* Instead, *Miller* held that an individual's youth should be treated "as a sentencing factor akin to a mitigating circumstance." *Id.* The sentencing procedure required for that consideration should be similar to what is required for death-penalty cases—individualized consideration of relevant mitigating circumstances by the sentencer "when deciding whether to impose the death-penalty." *Id.* at 1316. As with

14

death-penalty cases, sentencers are afforded "wide discretion in determining 'the weight to be given relevant mitigating evidence.'" *Id.* (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)).

¶34.   *Jones* further provided:

> Determining the proper sentence in such a case raises profound questions of morality and social policy. The States, not the federal courts, make those broad moral and policy judgments in the first instance when enacting their sentencing laws. And state sentencing judges and juries then determine the proper sentence in individual cases in light of the facts and circumstances of the offense, and the background of the offender.

*Id.* at 1322.

¶35.   Not surprisingly, neither *Miller*, *Montgomery*, or *Jones* mentions *Ake*.  The Court in *Ake* held that "in the context of a capital sentencing proceeding," a defendant is entitled to a mental-health expert only "when the State presents psychiatric evidence of the defendant's future dangerousness."  *Ake*, 470 U.S. at 83; *see also Tuggle v. Netherland*, 516 U.S. 10, 12, 116 S. Ct. 283, 284, 133 L. Ed. 2d 251 (1995) (*Ake* held that "when the prosecutor presents psychiatric evidence of an indigent defendant's future dangerousness in a capital sentencing proceeding, due process requires that the State provide the defendant with the assistance of an independent psychiatrist." (citing *Ake*, 470 U.S. at 83)); *Simmons v. South Carolina*, 512 U.S. 154, 164, 114 S. Ct. 2187, 2193, 129 L. Ed. 2d 133 (1994) ("where the State presents psychiatric evidence of a defendant's future dangerousness at a capital sentencing proceeding, due process entitles an indigent defendant to the assistance of a psychiatrist for the development of his defense" (citing *Ake*, 470 U.S. at 83-87)).

¶36. Here, the State presented two witnesses, Alexander's counsel for the capital-murder trial and the investigator who investigated the killing. The State presented no psychiatric evidence against Alexander. Consistent with **Simmons** and **Bishop**, Alexander was not entitled to funds for a psychiatric expert.

¶37. Further, we find the reasons set forth in Alexander's motion too general and undeveloped for meeting the preliminary-showing requirements of **Ake**. As the Court of Appeals dissent pointed out, Alexander argued that the sentencer "has a need for developmental expertise to consider relevant clinical information about Alexander's developmental status at age 17." **Alexander**, 2021 WL 671340, at *9 (Carlton, P.J., dissenting). Alexander, however, "failed to establish that he possessed a particular developmental issue that required expert assistance to investigate." **Id.** at *9; *cf.* **Evans v. State**, 109 So. 3d 1044, 1048-49 (Miss. 2013) (finding that defendant diagnosed with post-traumatic-stress-disorder (PTSD) was entitled to funds for a PTSD expert to assist in his murder defense).

¶38. We also find that Alexander failed to make a sufficient showing entitling him to funds to hire a mitigation investigator. This Court has never interpreted **Ake** to mandate the appointment of a mitigation expert or investigator for sentencing in capital trials. In **Fisher v. City of Eupora**, 587 So. 2d 878, 883 (Miss. 1991) (first, third, and fourth alterations in original), we stated as follows:

> [T]his Court has not interpreted **Ake** to mean that an expert must be supplied any time an indigent defendant requests one. In **Johnson v. State**, 529 So. 2d 577 (Miss. 1988), the defendant requested a fingerprint expert. We said "that there was not such a high risk of inaccuracy in fingerprint evidence as to

16

determine in this case that the defendant was denied a fundamentally fair trial." *Johnson*, 529 So. 2d at 592. In *Griffin*[*v. State*, 557 So. 2d 542, 551 (Miss. 1990)], the defendant asked for an independent psychologist and a ballistics expert. We said that "[w]here a defendant offers no more 'than undeveloped assertions that the requested assistance should be beneficial,' no trial court is under an obligation to provide him with fishing equipment." *Griffin*, 557 So. 2d at 550 [(quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985))].

¶39. Even before *Ake*, this Court had held,

That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare.

*Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984) (citations omitted).

¶40. Our case law routinely has placed the burden of mitigation investigation largely on defense counsel. *See Johns v. State*, 926 So. 2d 188, 196 (Miss. 2006) ("[A]t a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case." (alteration in original) (internal quotation marks omitted) (quoting *Payton v. State*, 708 So. 2d 559 (Miss. 1998))); *see also Butler*, 608 So. 2d at 321 ("Why should an investigator be necessary to perform tasks an attorney ordinarily performs?"); *Griffin*, 557 So. 2d at 551 ("[We] must conclude the defense was not nearly as desirous of obtaining facts favorable to the defendant for presentation to the court and jury as to sandbag a trial court into reversible error by getting him to overrule the motion[.]" quoting *Ruffin*, 447 So. 2d at 118-19)).

¶41. Here, the record does not indicate whether defense counsel ever attempted to conduct any sort of mitigation investigation on his own from when he entered an appearance in this

17

matter in November 2015. All we have before us is the motion filed by counsel in February 2016 for funds to hire a mitigation investigator to assist counsel. The motion claimed that "[t]he investigation in this case is complicated by the fact that Mr. Alexander has been incarcerated for nearly twenty years, and many of the relevant mitigating witnesses, documents, and other evidence may be difficult to locate."

¶42. This is too general and speculative to say that a sufficient showing was made entitling Alexander to a mitigation expert. Were we to hold otherwise on this record, we would be sanctioning a rule entitling every petitioner such as Alexander to public funds for a mitigation expert as a matter of due process. We must decline to do so, and we find no abuse of discretion in the trial court's decision to deny the motion for funds.

¶43. Because the Court of Appeals reversed and remanded the matter for a new *Miller* hearing, it did not address the other two issues raised by Alexander on appeal: (2) whether the trial court denied Alexander due process by not resolving whether he was a rare, permanently incorrigible juvenile homicide offender; and (3) whether the trial court deprived Alexander of his constitutional right to have a jury impose his sentence. We do so here.

**II.     Whether the trial court denied Alexander due process by not resolving whether he was a rare, permanently incorrigible juvenile homicide offender.**

¶44. Alexander contends that the trial court erroneously believed that *Miller* simply requires the sentencing authority to consider the *Miller* factors before deciding whether to impose a life-without-parole sentence on a juvenile homicide offender. He contends that this Court has yet to instruct the trial courts on a "procedure through which [a juvenile homicide

18

offender] can show that he belongs to [*Miller*'s] protected class." *Montgomery*, 577 U.S. at 210. Further, because the trial court denied funds for expert assistance, Alexander's trial counsel argued he was prevented from presenting evidence or arguments "show[ing] [Alexander's] crime did not reflect irreparable corruption[.]" *Id.* at 213.

¶45. As *Jones*, clarified, "*Miller* [holds] that a State may not impose a mandatory life-without-parole sentence on murderer under 18." *Jones*, 141 S. Ct. at 1321. *Miller* "mandate[s] 'only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing' a life-without-parole sentence." *Id.* at 1316 (quoting *Miller*, 567 U.S. at 489). Neither *Miller* nor this Court "require[s] the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence." *Id.*; *Chandler*, 242 So. 3d at 69 (noting that *Montgomery* "confirmed that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility." (Citing *Montgomery*, 577 U.S. at 211).

¶46. *Jones* also rejected the notion that "[e]ven if a separate factual finding of permanent incorrigibility is not required, . . . a sentencer must at least provide an on-the-record sentencing explanation with an 'implicit finding' of permanent incorrigibility." *Jones*, 141 S. Ct. at 1319. *Jones* explained:

> [A]n on-the-record sentencing explanation with an implicit finding of permanent incorrigibility (i) is not necessary to ensure that a sentencer considers a defendant's youth, (ii) is not required by or consistent with *Miller*, (iii) is not required by or consistent with this Court's analogous death penalty precedents, and (iv) is not dictated by any consistent historical or contemporary sentencing practice in the States.

*Id.*

19

¶47. Here, the trial court provided Alexander a *Miller* hearing after this Court granted Alexander's application for leave to proceed in the trial court with his PCR claim that *Miller* prohibits his mandatory life sentence. The trial court applied the *Miller* factors as interpreted and adopted by this Court in *Parker*, 119 So. 3d at 995. Upon considering the *Miller* factors, the trial found that each factor weighed against Alexander based on the evidence presented. The trial court concluded that Alexander should be sentenced to life without parole as a Section 99-19-81 habitual offender, and the court entered an order to that effect.

¶48. We find no abuse of discretion in the trial court's decision. The trial court considered "the facts and circumstances of the offense, and the background of the offender" from the evidence presented. *Jones*, 141 S. Ct. at 1322. That no further evidence was presented on Alexander's behalf is of no moment to this Court for purposes of this appeal.

### III. Whether the trial court deprived Alexander of his constitutional right to have a jury impose his sentence.

¶49. Alexander argues that based on the Sixth and Fourteenth Amendments to the United States Constitution, as well as article 3, sections 14 and 15, of the Mississippi Constitution, he was entitled to a jury determination as to whether he was one of the uncommon and rare juvenile offenders that could be sentenced to life without parole. He submits that due process requires "any fact that 'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Hurst v. Florida*, 577 U.S. 92, 97, 136 S. Ct. 616, 621, 193 L. Ed. 2d 504 (2016) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).

20

¶50. We rejected the same argument in *McGilberry v. State*, 292 So. 3d 199, 206-07 (Miss. 2020). We explained that *Miller* does not "impose additional fact-finding before a juvenile offender may receive the greater punishment of life without parole." *Id.* at 206 (reiterating that *Montgomery* "confirmed that *Miller* does not require trial courts to make a finding of fact regarding a child's incorrigibility" (internal quotation marks omitted) (quoting *Chandler*, 242 So. 3d at 69)). *Miller*, instead, "requires that before sentencing a juvenile to life without parole, the sentencing judge take into 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Id.* (quoting *Montgomery*, 577 U.S. at 208) (quoting *Miller*, 567 U.S. at 480)). "Stated differently, the *Miller* factors are not elements of the crime that the sentencer must find beyond a reasonable doubt to impose a life-without-parole sentence." *Id.* at 207.

¶51. Here, Alexander was subject to the habitual-offender statute, Section 99-19-81, following his 1998 conviction for the 1993 murder based on two previous felony convictions entered against him in 1997. As this Court has long held, a defendant is not entitled to a jury trial on the issue of habitual-offender status. *Adams v. State*, 410 So. 2d 1332, 1334 (Miss. 1982) (citing *Diddlemeyer v. State*, 398 So. 2d 1343 (Miss. 1981); *Yates v. State*, 396 So. 2d 629 (Miss. 1981); *Wilson v. State*, 395 So. 2d 957 (Miss. 1981)). Further, *Apprendi* expressly excludes the fact of a prior conviction. *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury . . . .").

¶52. Accordingly, this issue is without merit.

21

**CONCLUSION**

¶53. Finding no abuse of discretion in the trial court's decision to deny Alexander's motions for expert funds, we reverse the Court of Appeals' decision. We affirm the trial court's decision to sentence Alexander to life without parole based on Section 99-19-81, and we reinstate the trial court's sentencing order.

¶54. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE PANOLA COUNTY CIRCUIT COURT IS REINSTATED AND AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND ISHEE, J. CHAMBERLIN, J., NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶55. I would affirm the decision of the Court of Appeals that the trial court's denial of Norris Alexander's motion for expert funds rendered his sentencing hearing under ***Miller v. Alabama***, 567 U.S. 460, 132 S. Ct. 2455, 2458, 183 L. Ed. 2d 407 (2012), fundamentally unfair. The purpose of the sentencing hearing was to determine whether Alexander would receive the harshest sentence available for a juvenile, life without parole. Alexander demonstrated a substantial need for expert assistance to prepare his mitigation case. I would hold that the trial court abused its discretion by denying Alexander's motions for expert funds, which thwarted his ability to produce evidence at his sentencing hearing, at which he called no witnesses, tendered no exhibits, and adduced no mitigating evidence at all.

¶56. Fundamental fairness requires the State to provide "the 'basic tools of an adequate defense'" to defendants unable to pay for them. ***Ake v. Oklahoma***, 470 U.S. 68, 77, 105 S.

Ct. 1087, 84 L. Ed. 2d 53 (1985) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971)). "The determination of whether an indigent defendant must be provided expert funding is made on a case-by-case basis, and '[a] defendant must demonstrate a substantial need in order to justify the trial court['s] expending public funds for an expert to assist the defense.'" *Lowe v. State*, 127 So. 3d 178, 181 (Miss. 2013) (first alteration in original) (quoting *Richardson v. State*, 767 So. 2d 195, 198 (Miss. 2000)). Under *Ake*, three factors are relevant to determining whether an expert is required as a basic tool of an adequate defense: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id.* at 182 (quoting *Ake*, 470 U.S. at 77).

¶57. The first prong weighs heavily in an indigent defendant's favor because the private interest affected is the individual's interest in accurate criminal proceedings. *Isham v. State*, 161 So. 3d 1076, 1082 (Miss. 2015) (citing *Lowe*, 127 So. 3d at 182). The second prong, which is the government's pecuniary interest in being compelled to pay for an expert, is insubstantial; moreover, the government and the defendant share an interest in a fair and accurate criminal proceeding. *Id.* The third prong, "which this Court analyzes the most intensely, requires the trial court to balance the probative value of expert testimony for [the defendant] against the risk of not providing him expert assistance." *Id.*

¶58.   "The question of whether a defendant has a right to funds is a question left to the sound discretion of the trial court." *Moore v. State*, 287 So. 3d 905, 920 (Miss. 2019). A defendant must identify concrete reasons for the need for expert assistance. *Id.* (quoting *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994)). In the context of a *Miller* hearing, we have held that expert testimony is not always required, but it may be helpful in specific cases. *Id.* This Court will reverse the trial court's denial of expert funds if "the accused demonstrates that the trial court's abuse of discretion is so egregious as to deny him due process and . . . his trial was thereby rendered fundamentally unfair." *Id.* (quoting *Harrison*, 635 So. 2d at 901).

¶59.   I would hold that Alexander's reasons for needing an expert were sufficiently concrete to prompt the trial court's grant of at least some of the funds he requested for a mitigation expert and an adolescent developmental psychologist. Under *Miller*, the trial court was obligated to consider several factors in determining whether Alexander's sentence should include parole eligibility, or whether he should be given the harshest possible sentence of life without parole. Those factors include

> (1) the juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences,"
>
> (2) "the family and home environment that surrounds [the juvenile offender]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional,"
>
> (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him," and

24

(4) whether "he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."

*McGilberry v. State*, 292 So. 3d 199, 208 (Miss. 2020) (quoting *Parker v. State*, 119 So. 3d 987, 995-96 (Miss. 2013)). Alexander had the burden to show that *Miller* considerations warranted a sentence including parole eligibility. *Wharton v. State*, 298 So. 3d 921, 927 (Miss. 2019).

¶60. The majority expounds on the United States Supreme Court's most recent discussion of *Miller* proceedings in *Jones v. Mississippi*, 141 S. Ct. 1307, 209 L. Ed. 2d 390 (2021). *Jones* did not disturb the requirement that the sentencer consider the *Miller* factors. For that endeavor, evidence is required. But because of the trial court's denial of Alexander's request for expert funds, the only evidence presented at the sentencing hearing was that adduced by the State.

¶61. The majority extrapolates from *Jones* to hold that funding for a defense mental health expert is not needed for a *Miller* hearing unless the State offers psychiatric evidence against the defendant. But whether to allow funds for a mental health expert in a *Miller* case is a matter within the trial court's sound discretion. *Moore*, 287 So. 3d at 920. And as the majority incorrectly determines, *Ake* did not limit the necessity for expert funding to situations in which the State presents psychiatric evidence of future dangerousness. Rather, *Ake* held that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense[.]" *Ake*, 470 U.S. at 77. Therefore, the State must

25

provide indigent defendants "the 'basic tools of an adequate defense.'" *Id.* (quoting *Britt*, 404 U.S. at 227). Although *Ake* applied its holding in the context of a defendant's request for a psychiatric expert to confront the State's psychiatric evidence against him, its holding was not limited to that one scenario. Indeed, this Court has recognized that an indigent defendant's request for expert funding is evaluated under *Ake* on a case-by-case basis. *Lowe*, 127 So. 3d at 181 (quoting *Richardson*, 767 So. 2d at 198). *Miller* requires the sentencer to consider the defendant's youth and attendant characteristics and the circumstances of the defendant's participation in the crime. When, as in this case, an indigent *Miller* claimant has a history of adolescent mental health treatment and the trial court refuses funding for an expert to relate the significance of that treatment under *Miller*, the trial court's discretion has been abused.

¶62.    Alexander's motion in the trial court stated that he was requesting an expert in the area of adolescent developmental psychology "to provide valuable general information about adolescent development and [to] evaluate Alexander to form an opinion and testimony about his developmental characteristics relevant for mitigation." Alexander argued that a psychologist could provide information about scientific research supporting the conclusions of the United States Supreme Court in *Miller* concerning adolescent development. In particular, he averred, such an expert could address the significance of Alexander's lengthy treatment in an in-patient mental health facility.

¶63.    Regarding the request for a mitigation expert, at the time of the *Miller* proceedings, Alexander was atypically situated because he had been incarcerated for more than twenty

26

years. Therefore, he argued, a mitigation expert was necessary to enable investigation of the distant past and to permit his counsel to present evidence relevant to each *Miller* factor. Alexander cited the American Bar Association Guidelines, which provide that "'[the] penalty phase preparation requires extensive and generally unparalleled investigation into personal family history.' At least in the case of the client, this begins with the moment of conception." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 cmt. (2003) (footnotes omitted) (citations omitted). According to Alexander, a substantial amount of mitigation evidence existed relating to his family and home environment and "[e]very aspect of [his] life from conception to the present day must be investigated."

¶64. Although the majority opines that Alexander's request for expert funding was not sufficiently concrete, I would not hold indigent defendants to a standard that requires more specificity than Alexander provided. The information put forth by Alexander was sufficiently detailed to enable the trial court to understand the reasons he was requesting the experts. An indigent defendant should not be forced to hire an expert to investigate his or her background and mental condition in order to draft an adequate motion for expert funds.

¶65. I would hold that the careful *Ake* analysis by the Court of Appeals was eminently correct. As the Court of Appeals recognized, Alexander's "goal of obtaining [the assistance of a mitigation expert] was to have witnesses who would be versed in Alexander's history and be able to testify about that history to the sentencing court." *Alexander v. State*, No. 2019-KA-01612-COA, 2021 WL 671340, at *7 (Miss. Ct. App. Feb. 22, 2021). Alexander,

who had spent more than twenty years incarcerated, lacked access to school records, the records of his in-patient psychiatric treatment, and other relevant records. Because the trial court denied Alexander's request for a mitigation expert, he was able to present no evidence about his past, and his attorney did not object when a State's witness offered opinions that were within the expertise of the requested mitigation expert. "Simply put, the court's failure to provide an expert to assist the attorney in discovering and testifying to potential mitigating evidence contributed, in part, to the fundamentally unfair nature of the hearing." *Id.* Further, Alexander received no funds for an adolescent developmental psychologist despite his attorney's clear statement in the motion for funds that Alexander had received in-patient treatment in a mental health facility, a matter that, though exceedingly relevant under *Miller*, was not developed for the vitally important sentencing hearing.

¶66.    Due to the denial of the motions for expert funds, the trial court was left with an incomplete picture of Alexander's background with which to evaluate the *Miller* factors. Indeed, the trial court found that Alexander had "put on no proof" and "presented no testimony." But that was because Alexander "was deprived of the opportunity to present testimony and proof to rebut the State's testimony because he did not receive funds for either expert." *Id.* I agree with the assessment of the Court of Appeals that Alexander was not necessarily entitled to the full $40,000 in expert assistance that he requested. Nonetheless, the circuit court's failure to grant Alexander any expert assistance whatsoever resulted in his inability to develop witnesses or evidence for use in an effort to rebut the evidence presented by the State. Due to the denial of expert funds, Alexander's sentencing hearing was

28

fundamentally unfair, and he was deprived of due process of law. Therefore, I respectfully dissent.

**KING, P.J., AND ISHEE, J., JOIN THIS OPINION.**